[Crim. No. 2874. In Bank.—November 9, 1926.]

THE PEOPLE, Respondent, v. S. C. STONE, Appellant.

[1] CRIMINAL LAW—MURDER.—In this prosecution for murder it is held that the evidence was sufficient to establish the death and identification beyond the peradventure of a doubt and to exclude any reasonable hypothesis that death was due to natural causes, justifiable homicide, suicide or accident, and that the facts were sufficient to establish the *corpus delicti* independently of extrajudicial statements and admissions of the defendant.

[2] ID.—CONNECTION OF DEFENDANT AND CRIME—SUFFICIENCY OF EVIDENCE.—In this prosecution for murder it is held that the evidence was sufficient to connect the defendant with the commission of the crime.

[3] ID.—CONSCIOUSNESS OF GUILT.—It is held that while there was no direct confession of guilt by the defendant in this case, the inferences to be drawn from the facts and circumstances shown in evidence and the statements and admissions of the defendant, clearly indicating a consciousness of guilt, warranted the jury in finding that he was the perpetrator of the offense charged.

[4] ID.—PENALTY—SECTION 190, PENAL CODE.—Under section 190 of the Penal Code, the responsibility of fixing the penalty in a prosecution for murder rests solely with the jury.

[5] ID.—ALLEGED MISCONDUCT OF DISTRICT ATTORNEY—OPENING STATEMENT.—In a prosecution for the murder of two little girls, the district attorney was not guilty of prejudicial misconduct, in his opening statement, in alleging, among other things, that he expected to prove that the defendant took the deceased out riding for a lustful purpose, that at the time of his arrest he had upon his person the things that go with a libertine and that when the children were found the circumstances indicated that they had been debauched, where the statement and offer of proof were made in good faith and information was in the hands of the district attorney from which his conclusions might reasonably be drawn.

[6] ID.—OTHER OFFENSES—OFFER OF PROOF—ALLEGED MISCONDUCT OF DISTRICT ATTORNEY.—In such a case the offer of the district attorney of proof that defendant was guilty of misconduct with a girl other than the deceased, even if the evidence was inadmissible, was not misconduct where the district attorney was not acting in bad faith in making the offer.

4. See 13 Cal. Jur. 743.
5. See 8 Cal. Jur. 360.

[7] ID.—ALLEGED MISCONDUCT OF JUDGE.—In a prosecution for murder the statement by the court during the trial that the court would "go out and visit the premises where the *killing* is alleged to have taken place," was not prejudicial misconduct in the use of the word "killing."

[8] ID.—VIEWING SCENE OF HOMICIDE BY JURY—FAILURE TO SWEAR OFFICER.—In a prosecution for murder, the complaint that the record does not show that the officer was sworn before taking charge of the jury for the purpose of viewing the premises of the homicide, cannot be maintained, where the defendant stipulated that the officer might act in that capacity, and no objection was made to the proceedings at the time and it is not made to appear that the defendant suffered the slightest prejudice by reason of the omission.

[9] ID.—RECORD ON APPEAL—ARGUMENT OF DISTRICT ATTORNEY.—In a prosecution for murder, where the defendant gave notice of appeal and made application for an order for the preparation of the record on appeal, including the arguments of the district attorney and defendant before the jury, complaint that the arguments of the district attorney were not set forth in full in the reporter's transcript, cannot be sustained, where the transcript does purport to set forth those portions of the arguments on behalf of the people to which the defendant objected at the time, and defendant offered no objection to the transcript when served on him.

[10] ID.—PLEADING—INDICTMENT—SEPARATE COUNTS CHARGING DIFFERENT MURDERS.—In a prosecution for murder, objection of the defendant that he was charged, found guilty and sentenced to be hanged on each of two counts of murder, the first count charging him with the murder of one person, and the second of another person, comes too late on appeal, where no demurrer was filed or other objection made in the trial court as provided in sections 1004 and 1185 of the Penal Code.

---

(1) 30 C. J., p. 285, n. 38, 45, p. 288, n. 90.    (2) 30 C. J., p. 296, n. 19.    (3) 16 C. J., p. 930, n. 93; 30 C. J., p. 310, n. 25.    (4) 30 C. J., p. 455, n. 77, 79.    (5) 16 C. J., p. 890, n. 46; 17 C. J., p. 62, n. 94, p. 298, n. 22.    (6) 16 C. J., p. 893, n. 7; 17 C. J., p. 56, n. 16, p. 325, n. 72, p. 326, n. 80.    (7) 17 C. J., p. 295, n. 63.    (8) 17 C. J., p. 61, n. 84, p. 354, n. 82.    (9) 17 C. J., p. 158, n. 4.    (10) 17 C. J., p. 53, n. 90.

APPEAL from a judgment of the Superior Court of Los Angeles County and from an order denying new trial. Edwin F. Hahn, Judge. Affirmed.

---

10.   See 14 Cal. Jur. 87.

The facts are stated in the opinion of the court.

Chandos E. Bush for Appellant.

U. S. Webb, Attorney-General, and John L. Flynn, Deputy Attorney-General, for Respondent.

SHENK, J.—The defendant was accused by the grand jury of Los Angeles County of the murder, on August 23, 1924, of Nina and May Martin, eight and twelve years of age respectively. The jury found him guilty of murder in the first degree and fixed the penalty at death. He was sentenced accordingly and has appealed from the judgment of conviction and from the order denying his motion for a new trial. The primary question for our consideration is the contention of the defendant that the *corpus delicti* was not established and that therefore the court erred in admitting in evidence his extrajudicial statements and admissions. The facts tending to establish the *corpus delicti* are undisputed and are substantially as follows:

The deceased were the children by a former marriage of Mrs. Paul Buus. Prior to the time of their disappearance they were living with their mother and stepfather at 2854 South Mansfield Street in the southwesterly portion of the city of Los Angeles. They were healthy and apparently normal children and left their home in a happy frame of mind about 6:15 P. M. on August 23, 1924, to go to the home of their grandmother who lived about three blocks distant. They were never seen alive after that night. When they did not return home that evening their disappearance was heralded abroad and searching parties were organized. Several hundred persons, officers and inhabitants of the neighborhood, engaged in the search without avail. On February 4, 1925, Julio Martinez, a Mexican youth, discovered what proved to be their remains in a small ditch from eighteen inches to two feet in depth. This ditch for some distance traversed a large cultivated field near the base of the Baldwin Hills in the same section of the city and had been used at one time as an irrigating ditch. At the time of the discovery the land in the vicinity was being sowed with seed in anticipation of a forthcoming spring crop of grain. There were no trees in the locality,

but tall weeds had grown along the ditch where the bodies lay. The remains were covered with cut weeds and the only part thereof exposed to view was a small portion of a leg of one of the children. A shoe was on the foot and another shoe was found some seventy-five feet away. The bodies were badly decomposed, practically nothing remaining but the skeletons. The body of the older girl lay face downward with the head toward the north and was to the right of the body of the smaller girl, which lay in the same direction and a foot or two distant. The clothing of both was disarranged but was positively identified as the clothing worn by the children at the time of their disappearance. The measurements of the bodies corresponded with those of the living children. The place where the bodies were found was several hundred feet southerly from the Pacific Electric Railway Company's "Air Line" tracks which ran along a slight embankment. The territory southerly from the railway tracks was an uninhabited section and extending from the spot where the remains were found to the nearest highway was an old dirt road or trail. Across the railroad track to the north was a tract of land newly subdivided.

[1] From the facts and circumstances shown in evidence death and identification were established beyond the peradventure of a doubt. Furthermore, the showing of the age of the children, the circumstances of their home life, their sudden disappearance, the discovery of the bodies covered with cut weeds in a ditch in an isolated field as above related were sufficient to exclude any reasonable hypothesis that death was due to natural causes, justifiable homicide, suicide or accident. The only inference that could reasonably be drawn from these facts and circumstances was that the children had met their death as the result of criminal agency. Such facts and circumstances were therefore sufficient to establish the *corpus delicti* and were shown in evidence in advance and independently of extrajudicial statements and admissions of the defendant. Consequently such statements and admissions were properly received in evidence.

[2] The next contention of the defendant is that, assuming the *corpus delicti* to have been established, the evidence was insufficient to connect him with the commission of the crime. Aside from the statements and admissions

of the defendant hereinafter referred to it appeared in evidence that the children went to the home of their grandmother between six-thirty and seven o'clock on August 23, where they remained for a brief period. They were then seen for a moment at a neighbor's house where two other girls of about the same age were living and where the decedent children had. played parcheesi that afternoon. They were then seen to enter and leave a near-by store where they had purchased some confections. About sundown that evening they were seen riding westerly on Jefferson Street near Potomac Street in the Dodge roadster of the defendant. The defendant was driving the car. He was dressed in his uniform. His employment was that of a night watchman in an organization known as the West Adams Patrol, whose business it was to provide for the protection of persons and property in the neighborhood at the voluntary expense of some of the inhabitants thereof. As the car was so proceeding on Jefferson Street it was wobbly in its movements and uncertain in its speed and when it suddenly turned to the left without signal it nearly collided with another car, some of whose occupants knew and recognized the defendant and the Martin girls. The children were again seen "about dark" with the defendant in his car at another place in the same neighborhood. On the next day, Sunday, the defendant was seen to drive his car to a point on the northerly side of the Pacific Electric Railway track near the newly subdivided tract, remove from the car a large bundle with newspaper wrappings and carry the same up to and over the railway track, then down and out of sight toward the place where the bodies were found. In the defendant's car at the time was a man later identified as Shorty Smith. This man did not leave the car during the excursion of the defendant across the railway track but as he sat in the car he fidgeted nervously and continually mopped his face with his hand. When the defendant returned to the car he entered the same and the two men rode away. At the time of the arrest of the defendant a rouge box was found in his room which was identified as a rouge box that had belonged to May Martin. Shortly after the disappearance of the children evidences of blood were found on the seat, floor and running-board of

the defendant's car. Reference to this incriminating circumstance will hereafter be made.

The statements and admissions of the defendant which tended to connect him with the commission of the crime were developed through the testimony of numerous witnesses, the most damaging of which came from the lips of a fellow-prisoner of the defendant while in the county jail. This witness was Alva H. Floyd, who had been city recorder of Culver City for several years and is referred to in the record as Judge Floyd. This witness was confined in the same tank with the defendant and was approached by the defendant with a request that he advise the defendant as to how he could extricate himself from his difficulty with reference to the Martin girls. This witness was not an attorney at law but he told the defendant that he would help him if he were told truthfully all the facts with reference to the defendant's relations and conduct with those girls. A dozen or more conferences were had between the two. After each of these conferences the witness transcribed the substance of the conversation in typewriting. These transcriptions were in the form of question and answer. They were read by the defendant in the presence of the witness and the accuracy thereof was never challenged by the defendant. During these conversations the defendant related that he knew the Martin girls, had taken them riding with him frequently in his automobile and had them with him in his room on at least one occasion; that Shorty Smith was batching with him in his room in August, 1924, and was assisting him at times in the performance of his duties as night watchman; that on the morning of August 23d the defendant arose about 10 o'clock; that he and Smith had breakfast together and then worked for a couple of hours on the defendant's car; that they then went into the house, had something more to eat, drank some brandy, slept for a couple of hours, and then had three more drinks; that they then separated but returned to the house about 5 o'clock in the evening and had three more drinks; then in the evening the defendant picked up the Martin girls and went for a ride; that he bought them candy and then took them to a moving-picture show. He was asked: "Stone, did you ever at any time take any of the girls you had with you down to your room in the rear of the barber-shop?" and

he replied: "Now, Judge, I will not stand for this to be brought out in case there is a trial as it would mean the gallows for me. I have had dozens at my room at different times." He stated that he did not take small boys to his room because "they talked too much." When asked if he ever drank in the presence of the girls or offered them drinks, he stated, "Yes, I have taken many drinks before the girls, and some of them have drank with me, and two or three of them drank a little too much, and I had to get something at the drug-store to fix them up before letting them go home." When asked, "Stone, when you and the Martin girls were at your room, and May had two or three drinks, did you play and feel of her," he replied: "Sure I did; what do you suppose I had her down to the room for? Q. Did you do the same thing to the little girl, Nina, in front of May? A. No, I didn't like her, and she was too stuck up to have a good time." He was asked how he managed to get girls to go to his room and to keep them there. He replied: "Judge, I told you a few moments ago that I wouldn't stand for this to be brought out, and I am going to tell you that you don't know girls. . . . I promised that I would get them into the movies with my boy Jack, and I would take them down to my room, show them Jack's pictures, and all you have to do is to promise them that Jack will make a star out of them in a short time. . . . I always tell them a funny story and give them a glass of wine, and if I did not have a glass of wine I would give them a little peach brandy. Q. Did all the girls you had at your room drink with you? A. Not all but most of them."

Floyd further testified that on July 27th he again asked the defendant about the Martin girls and what was the reputation of May Martin among the other girls that he had out with him. The defendant answered: "They didn't like her. They said she was no good and too fast." He was then asked what he thought about May Martin and he answered: "She was no faster with me than the other girls. Q. At the time the two Martin girls were down at your house did they take a drink and how long did they stay? A. They were there only once and if I recollect correctly the little one did not take a drink but May had two or three. Q. Now, Stone, do you remember about what time you and the two girls May and Nina Martin left your

room to return to their home? A. I want you to under-stand that you are not going to get me to say that I murdered these girls. To hell with the district attorney's office and the sheriff, let them prove that I murdered the Martin girls.''

The defendant admitted to Floyd that he recalled the incident of nearly having a collision with another car on Jefferson Street on the evening of August 23d. He first denied that the children with him at that time were the Martin girls, giving the names of other children in the neighborhood as the names of those who occupied the car with him at that time, but he finally stated that the Martin girls were with him on that occasion. He admitted to this witness that he carried the large bundle across the railroad tracks on August 24th, but when asked what was in the bundle he refused to state. He admitted that Shorty Smith was with him on that occasion, but when asked where Shorty Smith lived he stated: ''Thank God, he is gone to Arizona, and no one knows his address but myself, and I will keep it. . . . I don't want this boy Shorty Smith back here and if I can keep him away I am going to do so.'' The de-fendant was then asked: ''Stone, just tell me why you do not want Shorty Smith back in Los Angeles, has he got something on you about these Martin girls or does he know something else that you are mixed up in that has not been brought out? Do you think that Shorty Smith had any-thing to do with the murder of the Martin girls?'' He answered: ''I don't want him back here as the sheriff's office would grab him and God only knows what he would tell. He would say anything to save his own hide. He is a crook, I thought so when he was working for me. He is a dangerous kind of a fellow, will do anything. Q. Well, listen, Stone, if he is not connected with the Martin murder, let him talk, how can he hurt you? A. Judge, are you crazy? I told you a few moments ago that Shorty Smith was working for me on the night they say the Martin girls were killed, and he knows that I had them out in my car when I passed him in front of the drug store. The sheriff's office would make him say I killed them, and he might even sign a statement, you know what the other boy did. He talked too much. I don't want him back here. Q. Stone, you had been drinking all day Saturday and you are posi-

tive you remember everything that happened that afternoon and that night? A. Yes, I told you the truth and if they hang me I will say the same thing. Q. Stone, you have been an officer for thirty years, and I am going to ask you, as man to man, if you think it sounds good for a man to say he let two girls out of his car at 12:30 at night at their father's home, and they were found months afterwards dead? Stone, if you are protecting Shorty Smith in this case be a man and tell me. If you did it yourself, tell me, and I can figure out at least something for you. A. No, it doesn't sound right, but I am not the man that killed them, and if I did I wouldn't say so. No man can ever say a Stone ever said anything about what they did. They can't find Shorty Smith and they will not be able to convict me.'' Shorty Smith was called as a witness for the prosecution, but when asked where he was and what he did on the evening the children disappeared and the next day he consistently stated that he did not remember. The defendant was asked by Floyd to explain the presence of blood on the seat and floor and running-board of his car shortly after the 23d of August. The defendant had formerly stated to this witness that on that day he had taken Mrs. Gold and her daughter to Manhattan Beach. Later he said that on that trip he had gotten a sack of chickens and carried them on the seat of his car and that blood ran out of the sack on the seat and on the floor. When confronted by Floyd with these inconsistent statements and asked to tell the truth about it the defendant replied: ''Well, the truth of the matter is, I lied in both cases. I never went to the Beach on that day, and I will tell you all some day.'' Floyd asked him: ''Between you and myself why was it these Martin girls were placed where they were found?'' He answered: ''I don't know unless it was because the dirty old sewer ditch was there, and it would be hard to notice the odor. Q. Stone, when you and Shorty Smith started out to throw that bundle away, what caused you to go where you did and be forced to walk four blocks over the railroad and through weeds, when a paved boulevard ran within fifty feet of where you laid the bundle? A. I don't know. Q. By the way, Stone, what motive do you think anyone could have had to murder these children? A. I don't know, without somebody got the best of the

older one and the little devil put up a scream that she was going to tell and start serious trouble. May be they had been drinking or something like that. One thing, the man that did it will never tell.'' The witness asked him: ''Stone, I am going to be honest in telling you you have got a hard proposition to beat, and without you can show every step you made from the time you picked up those Martin girls until you carried them back home, our backs will be against the wall. If the district attorney prefers charges against you for murdering those two Martin girls and you are unable to explain your whereabouts on the night of August 23d, after the people saw you with the girls in your car, I would advise you to see what kind of an arrangement can be made with the district attorney's office, and if you do not, your case will be about the same as the Clark case at San Diego [*People* v. *Clark,* 70 Cal. App. 531, 233 Pac. 980]. You remember the particulars of that case?'' and he answered: ''Judge, I have been in a lot of trouble in my life and managed to get out by one way or another, but this girl affair is the worst I ever had. I could fix this up if I had not plead guilty to the Merritt case. . . . I have told you more about my troubles than any man in the world, as I believe you will stick with me, but if you ever tell anybody what I have told you, I will shoot you on sight, or if I am in San Quentin, I will have one of my boys to kill you.'' Floyd testified that on another occasion the defendant expressed regret because he had talked at all about the case. He flew into a rage, according to this witness, and said with profanity that he would give his right arm if he could recall what he had told him, and that if Floyd ever mentioned what he had told him he would kill him on sight.

The defendant also stated to the witness Elliott, who was another fellow-prisoner in the county jail, that ''He didn't think they would ever find Shorty Smith, that he was gone, . . . that he hoped that they never would find him.'' He was asked, ''Why not?'' and he replied, ''Well, he ain't competent and he knows too much.''

On June 29, 1925, Captain Hunter of the district attorney's staff had a conversation with the defendant in which the latter was questioned as to his movements on August 23 and 24, 1924. He was uncertain and incon-

sistent in his replies. The defendant admitted, however, that he had nearly collided with a machine on Jefferson Street on the evening of the 23d. Captain Hunter was making a written memorandum of the conversation at the time. As it was about completed the defendant "grabbed" the piece of paper from Captain Hunter's hand and destroyed it.

During the investigation as to the cause of the disappearance of the Martin children the defendant was taken to the sheriff's office and there confronted with certain persons who had made statements tending to connect him with the commission of the crime. Among those persons was Mrs. Winifred F. McIntosh, who was one of the occupants of the car with which the defendant's car nearly collided on the evening of August 23d. She was ushered into the presence of the defendant on that occasion, and when asked to relate what the defendant did or said and what otherwise occurred on that occasion, replied: "Well, he said when I first went in, he said, 'How do you do, Mrs. McIntosh?' he said, 'All I ask you women to do is to tell the truth, so if you tell what you have been telling you are putting a rope around my neck'; I said, 'Mr. Stone, I have told nothing but the truth, and I have no intention of telling anything but the truth,' and then I asked—he asked where I had seen him, and I said, 'On Jefferson with the Martin girls,' and he said, 'My God, what is the use to fight? If you say that, it is the rope for me.' "

At numerous times during his acquaintance with May Martin the defendant had taken her with him in his car and had caused her to call at houses in the neighborhood to collect for him the two-dollar monthly fee for watchman services. On September 1, 1924, which was about a week after the children had disappeared, the defendant was asked by a woman who lived in the vicinity as to what had become of the little girl who used to come around and collect money for him, and his reply was that she had gone to Imperial Valley or Texas. Later on, when asked a similar question, he stated that the Martin children had gone to Chicago or some other place, where they would get better care than they received at home.

[3] Other evidence of inconsistent statements and of a shifting of position on the part of the defendant also appears in the record. A consideration thereof and of what has been above set forth satisfies us that the jury was justified in fastening upon the defendant the commission of the crimes. While there was no direct confession of guilt the inferences to be drawn from the facts and circumstances shown in evidence and the statements and admissions of the defendant, clearly indicating a consciousness of guilt, warranted the jury in finding that he was the perpetrator of the offenses charged. (*People* v. *Tom Woo,* 181 Cal. 315 [184 Pac. 389]; *People* v. *Willard,* 150 Cal. 543 [89 Pac. 124].)

The defendant did not take the witness-stand, and the evidence adduced on his behalf, mainly for the purpose of reflecting on the credibility of certain witnesses for the prosecution and in the nature of an alibi, was inconsequential and obviously did not have the effect desired in the minds of the jury, which was the sole judge of the credibility of all the witnesses produced at the trial. [4] And under section 190 of the Penal Code the responsibility of fixing the penalty rested solely with the jury.

[5] It is also contended by the defendant that the district attorney was guilty of prejudicial misconduct. The claim is predicated, first, upon certain portions of the opening statement of the prosecutor. In that statement the district attorney told the jury that he expected to prove that Deputy Sheriff Stensland arrested the defendant; that the defendant told him at that time "that he had been in the habit of taking little girls out for a ride; that it was his duty as a watchman to take them out riding; . . . that he expected to prove that the defendant took them out for a lustful purpose; that at the time of his arrest he had upon his person the things that go with a libertine; . . . that when these children were found, the disarticulated corpses or skeletons that lay there, the position in which they were lying, the clothing as it was pulled up about them, the feet in the ground and the bloomers torn from the bodies, that the children were debauched either before or after death or may be both." From an examination of the record we are satisfied that this offer of proof was made in good faith. Information was in the hands of the

district attorney from which his conclusions might reasonably be drawn. Certain testimony introduced in support of the offer were stricken from the record on motion of the defendant, and the jury was instructed to disregard the same. The admissibility of this evidence presented a debatable question, but the trial court ruled in the defendant's favor. The complaint is without legitimate foundation. Furthermore, no objection was made by counsel for defendant to that portion of the opening statement at the time it was made.

[6] During the course of the trial the district attorney endeavored to prove that the defendant was guilty of misconduct with other girls in the neighborhood, particularly with one by the name of Merritt, concerning whose case the defendant had been arrested and had entered a plea of guilty. Most of the testimony with reference to that case was stricken from the record on motion of the defendant and the jury instructed to disregard the same. The only portion not stricken was the statement of the defendant to the witness Floyd that he could have extricated himself from the difficulty in the case involving the Martin girls if he had not entered a plea of guilty in the Merritt case. No objection was made to that testimony and no motion was made to strike it out. Assuming that evidence with reference to the Merritt case was inadmissible, and we are not called upon to rule on that question, the action of the district attorney in making the offer of proof was not in bad faith and the rulings of the trial court with reference thereto were all in favor of the defendant. Numerous other charges of misconduct were made against the district attorney during the course of the trial. They have been examined with care. We find nothing upon which just criticism may be based.

During the trial the witness Floyd was asked to relate his conversation with the defendant on August 11, 1925. The witness commenced his answer by stating that the defendant told him on that occasion about killing three men in Gotham, Texas. The answer was not completed and was interrupted by counsel for defendant, whose motion to strike it out was granted. There is nothing in the record to indicate that the district attorney could have anticipated what the answer would be and the portion that was given

and stricken cannot reasonably form the basis of a charge
of misconduct on his part.

[7] Prejudicial misconduct is charged against the trial
judge. The trial was commenced on December 1, 1925, at
2 P. M. At the close of the day's proceedings it was sug-
gested by the district attorney that the jury be taken to
the place where the bodies were found for the purpose of a
view of the premises. Counsel for the defendant stated
that there was no objection and arrangements were made
for the defendant, court, counsel and jury to be taken out
the following morning. When the court convened at 10
A. M. on December 2d, the court announced that the court
would "go out and visit the premises where the killing is
alleged to have taken place." It is the contention of the
defendant that the use of the word "killing" in the quoted
statement of the court was prejudicial misconduct and he
relies on the case of *People* v. *Orosco*, 73 Cal. App. 580
[239 Pac. 82], wherein it was held in effect that the use
of the word "murder" in the presence of the jury in the
following question, "What is the use of taking up time
with an episode that happened after the murder?" was
misconduct on the part of the court. It was stated, how-
ever, in that case that said expression of the court taken
alone would not require a reversal. It will be noted in the
present case that the trial judge endeavored to safeguard his
statement by the use of the word "alleged" but it is argued
that he used it in the wrong place or not in the right con-
nection. The criticism of the language as used would seem
to be colorable but without substantial merit.

[8] Complaint is also made that the record does not
show that Captain Hunter was sworn before taking charge
of the jury for the purpose of viewing the premises. The
defendant stipulated that Captain Hunter might act in that
capacity, but assuming that the stipulation was insufficient
to dispense with the oath no objection was made to the
proceedings at the time and it is not made to appear that
the defendant suffered the slightest prejudice by reason of
the omission.

[9] After the conviction of the defendant and denial of
his motion for a new trial his counsel gave oral notice of
appeal and later on filed an application for an order for
the preparation of the record on appeal, specifying therein
the entire record, including the arguments of the district

attorney and the defendant before the jury. Pursuant to the application an appropriate order was made by the trial judge and the record was prepared. The defendant now complains that the arguments of the district attorney were not set forth in full in the reporter's transcript. The transcript, however, does purport to set forth those portions of the arguments on behalf of the people to which the defendant objected at the time. This was a sufficient compliance with the order. Furthermore, the reporter's transcript was duly served on counsel for the defendant and he tendered no objection to the same as prepared, served and approved.

[10] The defendant complains because he was charged in two counts with the crime of murder, was found guilty on each count and was sentenced to be hanged on each count. In the first count the defendant was charged with the murder of Nina Martin and in the second count with the murder of May Martin, all on the 23d day of August, 1924. The indictment was presented in conformity with section 954 of the Penal Code. No demurrer was filed or other objection made to the indictment in the trial court as provided in sections 1004 and 1185 of the Penal Code. The objection now urged therefore comes too late. (Pen. Code, sec. 1012; *People* v. *Byron,* 103 Cal. 675 [37 Pac. 754]; *People* v. *Ellenwood,* 119 Cal. 166 [51 Pac. 553]; *People* v. *Dean,* 66 Cal. App. 602 [226 Pac. 943].) We do not wish to intimate that the objection would have been well taken if seasonably made.

We find no error in the instructions given or in refusing instructions proposed by the defendant.

The record in this case is singularly free from any ruling that might be claimed to be error. Doubts as to the admissibility of evidence were uniformly resolved in favor of the defendant and he received a fair and impartial trial. The jury was fully and fairly instructed and under the law its determination of the facts and of the penalty cannot be disturbed on the appeal.

The judgment and order are affirmed.

Waste, C. J., Richards, J., Seawell, J., Curtis, J., and Finlayson, J., concurred.

Rehearing denied.