[Crim. No. 6632. In Bank. Mar. 2, 1961.]

## THE PEOPLE, Respondent, v. DARRYL THOMAS KEMP, Appellant.

Russell E. Parsons and Daniel N. Busby for Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Philip C. Griffin, Deputy Attorney General, for Respondent.

PETERS, J.—By indictment, defendant was charged with the commission of five felonies. In count one he was charged with the murder of Marjorie Hipperson on June 10, 1957. Count two charged the forcible rape, and count three the kidnaping of E. Helen Shelton, on July 15, 1959, while count four charged the forcible rape of and count five rape accomplished by threats of bodily harm to Lelah D. Sherman on May 12, 1959. As to all offenses defendant pleaded not guilty and not guilty by reason of insanity. The jury acquitted defendant of the charge contained in count four, but convicted him of murder in the first degree (count one), of the rape and kidnaping of E. Helen Shelton (counts two and three) and of the rape of Lelah D. Sherman as charged in count five. Thereafter the jury found defendant sane at the time of the commission of the offenses, and, in the separate proceeding required by section 190.1 of the Penal Code, imposed the death penalty on count one. The appeal is automatic under the provisions of section 1239, subdivision (b), of the Penal Code.

In view of the insanity plea, the court, under the provisions of section 1027 of the Penal Code,[1] at the time of plea, appointed Doctors Bailey and Smith, two qualified alienists, to examine the defendant and to report to the court as to his sanity. These doctors subsequently reported to the court that, while defendant was a sex psychopath, he was, in their opinion, legally sane at the times of the commission of the offenses and at the times of their examinations.

Also before trial, Dr. Gore, a qualified psychiatrist, under the provisions of section 1871 of the Code of Civil Procedure,[2] was appointed by the trial court to examine

[1]This section requires the court, when a defendant pleads not guilty by reason of insanity, to appoint at least two alienists to examine the defendant as to his sanity. Such alienists may thereafter be called by the prosecution, the defense, or the court, to testify on the subject.

[2]This section permits the trial court, before or during the trial of any action, civil or criminal, to appoint an expert where it appears to the court expert testimony may be necessary. Such expert may be called as a witness by either party to the litigation, or may be called by the court.

defendant with instructions to report to the court his findings as to the defendant's mental status. Dr. Gore thereafter, and prior to trial, rendered a written report in which he opined that defendant is a sadistic rapist, a sexual psychopath and sexual deviate, is emotionally immature and lacks responsibility, but concluded that defendant was legally sane at the time of the commission of the crimes, and was sufficiently sane to be able to cooperate with his counsel in the preparation of his defense. A Dr. Solomon, also a qualified psychiatrist, retained by defendant, reported that in his opinion defendant was mentally ill, was suffering from delusions of persecution, and was severely depressed. He called attention to an attempt at suicide made by defendant while in jail, and concluded that defendant did not have sufficient mentality to cooperate with his counsel in the preparation of his defense, and was and is legally insane.

After these reports were filed, the trial judge stated for the record that, before appointing these experts, he had had no doubts as to defendant's then sanity but had appointed them out of an abundance of caution, and that after reading the reports of the doctors he still had no doubts as to defendant's present sanity and his ability to cooperate with his counsel in the preparation of his defense.

██ Prior to trial the defendant orally, and in writing, attempted to discharge his counsel and to proceed in propria persona. When this was communicated to the trial judge he interviewed the defendant in the presence of both counsel. After carefully interrogating the defendant, during which interrogation the defendant repeated his request to discharge his counsel, and during which it developed that defendant was ignorant of the rules of procedure and evidence, the trial court ruled that "while the defendant understands the nature of the charges against him, he has not had sufficient legal experience or does not have legal knowledge enough to conduct . . . his defenses and Counsel will not be relieved." This was a correct ruling, and is not challenged by appellant. [██ The court would have violated defendant's constitutional right to counsel had it accepted "a waiver of counsel from anyone accused of a serious public offense without first determining that he [the defendant] 'understands the nature of the charge, the elements of the offense, the pleas and defenses which may be available, or the punishments which may be exacted.'" (*In re James,* 38 Cal.2d 302, 313 [240 P.2d 596] ; see also *People* v. *Linden,* 52 Cal.2d 1, 16 [338 P.2d 397] ; *People* v. *Chesser,*

29 Cal.2d 815, 822 [178 P.2d 761, 170 A.L.R. 246], and cases cited; *Uveges* v. *Pennsylvania*, 335 U.S. 437, 440 [69 S.Ct. 184, 93 L.Ed. 127].)

The trial, in its various phases, was a lengthy one.

After rendition of the jury verdicts, the defendant moved for a new trial, which motion was denied. Thereafter, he moved to reduce the murder conviction to one in the second degree, or, in the alternative, to reduce the penalty to life imprisonment. These motions, and also a motion for the court to declare a doubt as to present sanity, were denied, the court reserving to counsel the right to present additional evidence on the latter issue. Thereafter, at the request of defense counsel, and again acting under the provisions of section 1027 of the Penal Code, the court appointed Doctors McNiel and Tutunjian, qualified psychiatrists, to examine defendant and to report to the court their opinions as to his present sanity. Both concluded and reported that, in their opinion, defendant was presently sane. The court then refused to declare a doubt as to present sanity.

The evidence produced by the prosecution substantially supports the findings of guilt on all four counts of the indictment on which appellant was found guilty. The sufficiency of that evidence is not challenged except as to the murder charge, and then only on the ground that premeditation and malice were not sufficiently shown.

*The facts in reference to the charge involving the murder and rape of Marjorie Hipperson.*

The evidence shows that Marjorie Hipperson was raped and murdered some time during the early morning hours of June 10, 1957. Prior to her death Miss Hipperson lived in an apartment in Los Angeles, was employed as a nurse in a nearby hospital, and was engaged to be married to Dr. Deike, an intern at the hospital. On the evening of June 9, 1957, the employees at the hospital gave a combined stag party and shower for Dr. Deike and Miss Hipperson. At about 11:30 p. m. Miss Hipperson left the hospital in her automobile, alone, stating that she was going to her apartment. The doctor could not accompany her because he was on duty at the hospital that night. The next morning, when Miss Hipperson did not show up for work, Dr. Deike went to her apartment to investigate. He discovered that the front door to the apartment was chained from the inside (there was no back door), that a screen had been removed from a rear window, and that the window was open. He entered the apartment through that

window and discovered the dead body of Miss Hipperson lying on the bed in her bedroom. She was lying on her back with her nightgown bunched up around her upper body. There was a stocking wrapped around her neck, another stocking wrapped around one wrist, and a washcloth near her face. Her mouth was bruised, and she had numerous other bruises on different parts of her body. Subsequent investigation disclosed that she had been raped, and had died of strangulation. It was obvious that the washcloth had been used as a gag and that the stocking on her wrist had been used to tie her hands. Investigation by fingerprint experts disclosed a portion of a palm print on the wall beside the bed, which had been pulled out from its normal position, and another palm print on the window ledge where entry had obviously been made. The palm print on the wall was about 18 inches directly across from the buttock of the victim, and the palm print on the window ledge showed that the fingers were facing into the house when the print was made. These prints, according to the experts, had been made within 48 hours of their discovery, which was on June 10, 1957.

After appellant's arrest in July of 1959, prints were taken of his palms, and the prints taken from Miss Hipperson's room exactly matched them. The expert testified that the prints in the room were those of appellant, could not possibly have been made by any other person, and that it is not possible for two different human beings to have the same palm prints. Palm prints, so he testified, are as trustworthy as fingerprints as a means of identification. He was positive that the prints were those of the appellant.

An examination of the vaginal orifice of the body disclosed the presence of seminal fluid, and tests of that fluid disclosed that it was seminal fluid of the male with spermatozoa present in the fluid. Tests of that fluid and, after his arrest, tests of appellant's saliva and blood, disclosed to the experts that the seminal fluid was of a type that could have been that of appellant. This, like the usual blood test, is an exclusionary test— it does not positively identify the person, but it may exclude the person suspected. The test showed that appellant could not be excluded.

The autopsy established the cause of death as asphyxiation due to strangulation. The lacerations in and about the vagina, and the presence of the semen and spermatozoa indicated a forcible entry into the vaginal canal.

The fact that appellant was familiar with the apartment

where Miss Hipperson lived was established by the testimony of Marie Weber, who lived in the apartment directly across from that of Miss Hipperson. She testified that some time in 1956 a hand-printed note was slipped under the door of her apartment. This note stated that the writer had observed Miss Weber undress, that he had seen her body, and suggested that they get together for mutual satisfaction. Miss Weber reported the incident to the police and kept the note until after Miss Hipperson's murder, when she again told the police about it. After appellant's arrest, specimens of his handwriting were secured, and a handwriting expert testified that the note had been printed by the appellant.

*Facts as to the rape of Lelah D. Sherman on May 12, 1959.*

As to this charge there is no doubt of the identification of defendant. Mrs. Sherman testified that on May 12, 1959, she was in Griffith Park in Los Angeles, sketching. At about 3:45 p. m. she started to walk towards her bus stop, when appellant, whom she positively identified, drove up beside her and offered her a ride. When she got in the car appellant turned the car around and started towards the mountains. When Mrs. Sherman protested he told her that he wanted to show her the view because there were nice things to sketch up there. When they were high in the hills appellant stopped the car and Mrs. Sherman got out. Appellant indicated to her a path and told her that the view was in that direction. When she had progressed down the path a short distance he told her to stop, and started to push her. He then told her that resistance was useless, and that she might as well do what he wanted because otherwise he would throw her down the mountain, which was very steep in that area. She was frightened. He forced her to the ground. She tried to resist but he held her with one hand while he removed her slacks and panties with the other, took off his pants, and had intercourse with her. After the act was completed she was very frightened and did not know how she was going to get away. She got up from the ground, put on her clothing, and started to walk up the path. Defendant then offered to drive her to her bus station. Because they were far up in the mountains she got back in the car. On the way down the mountain appellant asked her if she liked to dance. Thinking that she could entrap him, she said that she did like to dance, and arranged to meet him the next Saturday night at the drugstore at Hollywood and Vine. When they came to Vermont Avenue and Sunset she asked to be let out of the car, and appellant stopped. She jumped out, ran over to a restau-

rant, and immediately telephoned the police. When the police arrived she told them of the rape and about the arrangements made for the next Saturday night. At the suggestion of the police she kept the date as she had arranged, but appellant did not appear.

*Rape and kidnaping of E. Helen Shelton on July 15, 1959.*

As to these offenses the identification of appellant was positive and the evidence of the commission of the acts overwhelming. Mrs. Shelton, who was also a nurse, testified that about 5:20 p. m. on July 15, 1959, she was driving through Griffith Park in an isolated area when defendant passed her in a green jeep truck and forced her to stop. Appellant, whom the witness positively identified, approached Mrs. Shelton's car, identified himself as a park attendant, told her that the road was closed and that she would have to turn around. While saying this he approached her car. Both doors were locked, but the window on the driver's side was down. Appellant reached in and opened the door. He grabbed her by her hair and threw her down in the street. He then beat her head on the street and said: "I am going to kill you; you are going to die." He beat her until she went limp. Appellant then dragged her to a secluded area and threw her down and kicked her. He ripped off one of her stockings and tried to put it around her neck. He then said: "Oh, damn, it is too short, there is not enough." He then ripped off part of her clothing and told her, in unmistakable language, that he was going to rape her. He kept beating her and threatening to kill her. Just before she lost consciousness she heard him say: "I am going to murder you, I am going to murder you like I did the Hipperson woman."[3] Appellant then hit the witness with a rock and choked her until she lost consciousness. She was not conscious when the rape was actually perpetrated. When she regained consciousness she had severe pains in her vaginal area and defendant was gone. She crawled up the path.

About this time two persons were driving along in their car in the general area. They saw the appellant running toward

---

[3]It should be noted that Mrs. Shelton was interviewed by the police in the hospital shortly after these events. She did not then tell the officers that her assailant had mentioned the Hipperson murder. She did, however, then tell the police that her assailant had said: "I am going to kill you and I have killed before." It should also be noted that in his argument to the jury the prosecutor very fairly stated that he was not going to rely upon Mrs. Shelton's statement that appellant had mentioned Miss Hipperson, but did, quite properly, argue that she had told the police that appellant had stated he had murdered before.

them, and, when he approached their car, appellant directed them to turn around, stating that the road was closed. About this time, Mrs. Shelton appeared from the side of the road, ran toward the witnesses' car and yelled "Stop, that man attacked me. . . . This man has raped me." Appellant ran over to his pickup truck, started up, and tried to run Mrs. Shelton down, very narrowly missing her. Mrs. Shelton was able to see most of the license number of the car.

Mrs. Shelton's clothes were in disarray and torn. She asked the witnesses to get her to a hospital. They drove to the nearby observatory and called police. The police testified that she was bruised and bleeding when they arrived, and that she told them she had been raped. They took her to the receiving hospital. There smears were taken and an examination made. She had undoubtedly been raped. There was semen and spermatozoa in the vaginal area. She had suffered a severe and brutal beating. She was in the hospital for a week and, at the time of trial (November 1959), was still under the care of a physician.

### Arrest of appellant.

Mrs. Shelton had given a good description of the pickup truck used by appellant. This description was broadcast to the police. About 10:15 that same night, July 15, 1959, a Los Angeles officer saw such a car, chased it for three blocks, and finally caused it to stop. The truck driven by appellant was loaded with personal belongings, including a shirt and a pair of overalls similar to those described by Mrs. Shelton as being worn by appellant during the attack. The officer arrested appellant and then requested a rebroadcast of the description of the vehicle of the rape suspect. Up to this time appellant had been very self-assured, but his attitude abruptly changed when he heard the requested rebroadcast. He then sat down on the curb with his head in his hands and refused to talk.

### Extrajudicial statements of appellant.

The next morning, July 16, 1959, Sergeant Close of the police department had a conversation with appellant. In that conversation appellant admitted that he had beaten Mrs. Shelton and expressed regret. He claimed, however, that he had not raped her. He explained the beating by saying that Mrs. Shelton had repulsed his advances and that he had become angry. He said that when arrested, he was on the point of leaving the Los Angeles area to go to San Jose to look for work. In the early evening of that day appellant again was inter-

viewed by Close and again made the admissions he had made in the morning. Up until this time the officers had only talked to appellant about the Shelton rape.

By late in the evening of July 16, 1959, the officers had connected appellant with the Hipperson murder through the medium of the palm prints. Close and Lieutenant Earl then, that same evening, had another conversation with appellant. They told him that they had information that appellant had been involved in other crimes, and, in particular, with the Hipperson murder and rape because of the palm prints. Appellant did not answer the accusation. Thereupon Lieutenant Earl, in some detail, reconstructed the Hipperson murder as he believed it had happened. Then appellant denied that he had killed any woman. The officers continued to accuse him of the murder and rape and he continued to deny that he had killed anyone, and denied that he had ever been near or in the apartment of Miss Hipperson.

The officers testified that, whereas in the earlier conversations appellant seemed eager to talk, in fact at least one of the conversations had been at his request, as soon as the Hipperson case was mentioned, there was an abrupt change in his attitude. He became silent, uncooperative and sullen.

Defendant did not elect to take the stand in his own defense in any portion of the trifurcated trial. However, he did present some witnesses. Several of them were members of his family. Through them, and through expert witnesses, he sought to prove, first on the trial of the guilt issue, that he did not have sufficient mentality to form the intent to commit any of the crimes charged, second, on the insanity trial, that he was insane, and third, on the penalty portion of the trial, that the death penalty should not be imposed because of his mental condition.

His mother, father, wife and other members of the family, testified as to a head injury suffered by appellant in a football game in 1951, and stated that thereafter he became forgetful, morose and committed some strange acts. They also testified as to his strange behavior in not recognizing or communicating with them after his arrest on the present charges. Evidence was introduced that he and his wife could not have children and that they attempted to adopt a child who was taken from them, and of appellant's obvious mental distress when this occurred. His wife testified as to his waking up in the middle of the night and taking long automobile rides without explana-

tion. Several deputies in the public defender's office testified as to appellant's strange behavior after his arrest, and of their inability to communicate with him. Several doctors testified that, in their opinion, he was medically and legally insane to such an extent that he could not form the required intent as to any of the crimes. One psychiatrist, a Dr. Thompson, had examined appellant in May of 1957, before any of the crimes here involved had been committed. He testified, on the guilt portion of the trial, that as a result of the examination then made he had formed and expressed the opinion that appellant was then suffering from a psychoneurosis. He stated that appellant was then in a chronic, constant state of anxiety, and had basic disturbances in his behavior pattern. At that time he recommended psychiatric treatment. He did not see appellant again until after his arrest. At that time he found appellant to be lethargic and depressed, and almost mute. Appellant did not recognize the doctor and seemed to be living in the past. The doctor was unable to secure any relevant information from appellant. The doctor found that appellant's memory and perception were impaired and completely disoriented with the present. Dr. Thompson stated that in his opinion appellant was not malingering, was schizophrenic, and that, at the time of the commission of the various acts charged, was in such a mental condition that he could not have formed the intent to commit the various acts charged, and could not have premeditated any of them.

Another psychiatrist, a Dr. Solomon, examined appellant after his arrest. He corroborated Dr. Thompson as to his then condition, and found it extremely difficult to communicate with appellant. He, too, was of the opinion that appellant, on the pertinent dates, was in such a mental condition that he could not form the intent or could not have premeditated the commission of any of the charged acts.

On the insanity trial similar evidence was introduced to show that appellant was insane, and this same type of evidence was introduced on the penalty portion of the trial to support the contention that the death penalty should not be imposed.

As opposed to this evidence the prosecution produced several experts who testified that at all relevant times appellant was legally sane and consciously and knowingly premeditated the commission of each of the crimes involved. They opined that the symptoms testified to by the defense doctors were the result of conscious malingering on the part of appellant in an attempt to escape the death penalty.

*Premeditation.*

Appellant contends that the evidence is insufficient to support the finding that the murder was of the first degree. Although appellant claims that the palm print evidence was inconclusive, the expert testified that the identification was positive and absolute. The expert also testified that the palm prints had been made within 48 hours of the murder. This placed defendant in the Hipperson apartment sometime within 48 hours of the time Miss Hipperson was killed.

Appellant places his main reliance in support of his contention that the evidence does not support the finding of first degree murder on the testimony of the psychiatrists produced by him who testified that appellant, in their opinion, at the time these crimes were committed, was in a mental state which they classified as ''unconscious,'' and mentally unable to form the requisite intent to commit such crimes. Appellant concedes that the prosecution experts testified to the contrary, but argues that his psychiatrists are more entitled to belief than those of the prosecution because their examinations were more lengthy and detailed. This is a frank suggestion that this court should reweigh the evidence. This, of course, we cannot do. Even if this court were of the opinion that the evidence produced by appellant was reconcilable with innocence, if the jury, on conflicting evidence, has found to the contrary, the reviewing court is powerless to interfere. (*People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778], and cases cited therein; see also *People* v. *Brubaker,* 53 Cal.2d 37, 40 [346 P.2d 8].)

 In the instant case the four qualified psychiatrists who testified for the prosecution, based on their examinations and upon the evidence at the trial and before the grand jury, opined that appellant entered the Hipperson apartment with intent to rape Miss Hipperson and that he then knew the difference between right and wrong, that he then realized the nature and quality of his acts and was capable of forming the specific intent required. This testimony was believed by the jury, and its finding is conclusive.

 Once it is established that appellant was mentally able to premeditate the crime here involved, there is no doubt but that the evidence supports the finding that the murder was one in the first degree. ''Murder is the unlawful killing of a human being, with malice aforethought.'' (Pen. Code, § 187.) Malice may be express or implied. ''It is express when there is manifested a deliberate intention unlawfully to take away

the life of a fellow creature. It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart.'' (Pen. Code, § 188.) It is also provided that: "All murder which is perpetrated by means of . . . any other kind of wilful, deliberate, and premeditated killing, or which is committed in the perpetration or attempt to perpetrate . . . rape . . . burglary . . . is murder of the first degree. . . ." (Pen. Code, § 189.)

There can be no doubt at all that the evidence supports the finding that this was murder in the first degree. The evidence demonstrates almost to a certainty that appellant entered the Hipperson apartment after first removing the screen from the window; that he entered with the intent to commit rape upon the occupant; that he entered the bedroom where he found Miss Hipperson in bed; that he tied a stocking around her neck and another around her hands; that he gagged her with a washcloth; that he then raped her and strangled her. The fact that the defendant left by the window is indicated by the fact that the only other exit from the apartment, the front door, was chained from within. The fact that force was used, and that the victim resisted, is indicated by the multiple bruises on her body and the fact that she was bound and gagged; the fact she was raped, and forcefully so, is indicated by the condition of the body and contents of the vaginal canal.

This, and the other evidence already reviewed, supports the finding that the killing was not only premeditated, was not only willful and deliberate, but was committed in the perpetration of a forceful rape. This evidence overwhelmingly supports the finding that the murder was one of the first degree. (See *People* v. *Rupp*, 41 Cal.2d 371, 380 [260 P.2d 1] ; *People* v. *Reed*, 38 Cal.2d 423, 431 [240 P.2d 590] ; *People* v. *Moore*, 48 Cal.2d 541, 547 [310 P.2d 969] ; *People* v. *Brubaker*, *supra*, 53 Cal.2d 37, 43.)

*Claimed error in the testimony of Dr. Gore.*

Appellant next contends that prejudicial error was committed in admitting into evidence the opinion of Dr. Gore that appellant was of a type that enjoyed sexual intercourse with a dead person, an affliction known as necrophilia. The statement of the psychiatrist to this effect did not come into the record in direct response to a question on that subject asked by the prosecution. The prosecutor asked Dr. Gore if, based on the physical facts of the case, which were included in

the question, he was "able to form an opinion as to whether or not he had the intent to rape Marjorie Hipperson at the time that he had this intercourse?" Dr. Gore responded that he had such an opinion and, in response to a question as to what that opinion was, responded: "My opinion is that this man had intention to rape a woman and I asked Mr. Kemp a question which seems to be borne out in your hypothetical statement here. I asked him if he enjoyed having sexual relations with a dead person and he told me 'No.' But now I believe that the man does enjoy sexual relations with a dead person necrophilia as we term it."

This testimony came in as a natural answer to the question, and there is no indication or claim that the prosecution knew, expected, or solicited this answer when the question was asked. The defense had introduced evidence that appellant was suffering from a mental disease which caused him to become mentally unconscious at times and rendered him unable to form the conscious intent to commit rape. Dr. Gore was called by the prosecution to rebut this testimony. It was in support of his conclusion that appellant had sufficient mentality to form the intent to commit rape, that the answer about intercourse with a dead person was given. The answer so naturally followed the line of questioning that defense counsel did not object to the answer, move to strike it or ask the jury to be admonished to disregard it. Normally some such action is required or the point is deemed waived. (*People* v. *Smith,* 151 Cal. 619, 624 [91 P. 511]; *People* v. *Lawrence,* 143 Cal. 148, 155 [76 P. 893, 68 L.R.A. 193]; *People* v. *Cole,* 141 Cal. 88, 91 [74 P. 547]; *People* v. *Williams,* 127 Cal. 212, 216 [59 P. 581].) There is nothing in the record to indicate any reason for not following this normal rule in this case. Certainly, even if allowing the testimony to remain in the record was error (and we do not think it was) under no stretch of the imagination could the error have been prejudicial.

## Joinder.

One of the major contentions of appellant is that it was error to join in one indictment, in separate counts, the charge of the murder of Marjorie Hipperson alleged to have been committed in June of 1957, the charges of rape and kidnaping of E. Helen Shelton, alleged to have been committed in July of 1959, and the rape charges involving Lelah Sherman, alleged to have been committed in May of 1959. It is contended that section 954 of the Penal Code does not authorize such a joinder in that the required common elements of

intent, persons involved, and time and place are lacking. There is no merit to the contention.

Section 954 of the Penal Code provides, in part, that ''An accusatory pleading may charge two or more different offenses connected together in their commission, or different statements of the same offense or two or more different offenses of the same class of crimes or offenses, under separate counts . . . the defendant may be convicted of any number of the offenses charged . . . provided, that the court in which a case is triable, in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately. . . .''

In the instant case the appellant took no steps prior to or during the trial to challenge the indictment for misjoinder. He did not demur to the indictment, nor did he move for a severance, nor did he object in any way before verdict to the joint trial.[4] Under such circumstances he may not properly complain on appeal that there was a misjoinder resulting in prejudice to him.

Section 1004, subdivision 3, of the Penal Code, provides that a defendant may demur to the accusatory pleading before entry of plea when it appears ''That more than one offense is charged, except as provided in Section 954.'' Section 1012 of the Penal Code provides that ''When any of the objections mentioned in Section 1004 appears on the face of the accusatory pleading, it can be taken only by demurrer, and failure so to take it shall be deemed a waiver thereof'' except in certain situations not here applicable. Under this section it is well settled that in the absence of demurrer or proper objection, the defendant must be deemed to have waived the point as the section expressly provides. (*People* v. *Stone,* 199 Cal. 610, 624 [250 P. 659]; *People* v. *Rankin,* 169 Cal.App.2d 150, 158 [337 P.2d 182].) This is so even where there is a clear misjoinder. (*People* v. *Cummings,* 173 Cal.App.2d 721, 730 [343 P.2d 944].)

Had a demurrer been filed on the ground of misjoinder, or had proper objection or motion been made, then the trial court, under the express provisions of section 954 would, upon a showing of good cause or by indicating that the interests of justice would best be served by a severance, have had discretion to order the counts, or some of them, to be tried separately. (*People* v. *Winston,* 46 Cal.2d 151, 158 [293 P.2d 40].) But because of the failure of appellant to take

---

[4]The objection was first raised on the motion for a new trial.

some such action the trial court was never called upon to exercise this discretion.

This is not to imply that had appellant taken some such action it would have been an abuse of the trial court's discretion to refuse a severance. Quite to the contrary, had some such motion been made, the trial court would have been justified if, in its discretion, it had denied the objection. In *People* v. *Chessman,* 52 Cal.2d 467, 492 [341 P.2d 679], after assuming that a proper objection in the trial court had been made to the consolidation of counts involving store robberies with counts involving kidnapings and sex crimes, it was said: ''It appears that the situation here comes within the holdings of cases which permit joinder of offenses, even though they do not relate to the same transaction and were committed at different times and places and against different victims, where there is a common element of substantial importance in their commission. [Citing four cases.] Here the element of intent to feloniously obtain property runs like a single thread through the various offenses, and we cannot see how defendant was prejudiced by joinder of the simple robberies and robbery-kidnapings with the revolting crimes in which sex offenses were connected with robbery.''

Also applicable here are the rules stated in *People* v. *Walker,* 112 Cal.App.2d 462 [246 P.2d 1009]. There, in separate counts, the defendant was charged with the murder of one victim, with murder, kidnaping and assault with intent to commit rape on a second victim, assault with a deadly weapon on a third victim and with the kidnaping and rape of a fourth victim. The appellate court held that the trial court acted well within its discretion in overruling a demurrer to that accusatory pleading. In so holding the appellate court stated (p. 471) :

''The charge of rape of Betty Maund and of assault with intent to commit rape of Doris Cook clearly belong to the same class of crimes, and the same is true of the charges of kidnaping the two women. Both rape and murder are forms of assault and both are offenses against the person. Moreover, a joinder of distinct offenses is permissible if there is a common element of importance in their commission. (*People* v. *Scott,* 24 Cal.2d 774 [151 P.2d 517].) Such a common element here appears in that the appellant was armed with the same gun and the gun was used in each set of offenses. We think a further common element may properly be said to appear in that in each instance a woman was kidnaped

and a common intent is clearly disclosed. It may be said here as was said in *People* v. *Thorn,* 138 Cal.App. 714 [33 P.2d 5] (approved in *People* v. *Duane,* 21 Cal.2d 71 [130 P.2d 123]) : 'The legislature, it seems to us, meant by the use of the words, ''the same class of crimes or offenses,'' in such sections, offenses possessing common characteristics or attributes, and it would seem that the different offenses set out in the information here do have many attributes in common.' ''

In the instant case appellant contends that the joinder of the rape and kidnaping charges, committed in 1959, with the murder alleged to have been committed in 1957, were, as a matter of law, prejudicial to him. It is pointed out that the evidence on the murder charge was circumstantial while the evidence on the rape and kidnaping charges was direct and overwhelming. It is also pointed out that one of the rapes, that of E. Helen Shelton, was of a particularly brutal character and was accompanied by a very severe beating. Joining this brutal offense with the murder charge, on which the evidence was only circumstantial, so it is contended, could not have helped but prejudice the jury on the murder charge. It is also pointed out by appellant that he had made direct admissions as to the brutal beating of E. Helen Shelton, while no such direct admissions were made as to the Hipperson murder. These are all matters that should have been addressed to the trial court and might have been material in that court in determining whether in its discretion separate trials would be ordered. But certainly it was not prejudicial as a matter of law for the court not to have ordered separate trials of its own motion. It must be remembered that, although the evidence as to the Shelton rape was particularly revolting, in that it involved a brutal beating, this was not the fault of the prosecution. Appellant admitted brutally beating the young lady. It was he who committed those acts and he must take the consequences.

The offenses here involved were not unrelated. They possess common elements of substantial importance. The crimes of rape, and murder and kidnaping are all forms of assault against the person. It is also a fact that there was a common *modus operandi* in all of these crimes. Each crime involved a woman that appellant found who was unprotected and alone. In each crime the obvious motive was satisfaction of appellant's sexual desires. Rape of his victims was common to all the cases. In the Shelton and Hipperson cases the methods adopted were identical. In both the victim was beaten. In

both appellant used a stocking of the victim in an attempt, in one case successful, to strangle his victims. The mere lapse of about two years between the murder and the other crimes does not of itself demonstrate the impropriety of the joinder. The tests are set forth in section 954. Once those tests have been met as they were in the instant case, there would not have been an abuse of discretion in denying a motion for separate trials, even if such motion had been made.

It is also the law that one asserting prejudice because of a joint trial assumes the burden of proving it. A bald assertion of prejudice is not enough. (*People* v. *Duane, supra,* 21 Cal.2d 71, 78; *People* v. *Northcott,* 209 Cal. 639, 648 [289 P. 634, 70 A.L.R. 806].) While appellant asserts that the jury must have been influenced by the evidence on the rape charges in considering the murder charge, the mere assertion of that fact does not prove it. The jury was correctly instructed that the evidence applicable to each offense had to be considered as if it were the only accusation before them. It will be presumed that the jury followed that instruction. (*People* v. *Foote,* 48 Cal.2d 20, 23 [306 P.2d 803].)

There was no error and no prejudice in the joint trial of these offenses.

### Evidentiary points.

Appellant next objects to the introduction into evidence of enlarged photographs, some in color, of the nude body of the deceased, contending that they could not help but influence the jury. The introduction of these photographs was the subject of careful consideration by the trial court, and they were permitted to be introduced only after the trial court became convinced, and so ruled, that they were reasonably relevant to the issues involved. This ruling was sound. Because the evidence on the murder charge was largely circumstantial, and because the prosecution had the burden of showing malice, it was necessary for the prosecution to introduce these various photographs to show the multiple bruises on the body in order to demonstrate that force had been used. While it is true that several of these photographs depicted portions of the unclothed body of the victim, it was incumbent on the prosecution to show that violence had been used. These photographs were necessary to show such violence, and they do so. They all were of probative significance. Most of them were related to proving the method of operation of appellant and the cause of death. Several of the photographs were necessary to show

the position of the bed, and the location of the palm print on the wall in relation to the position of the body of the victim. The photographs were not unduly cumulative. Each had a specific purpose reasonably related to the issues before the court. ▮▮▮▮ Although it is error to receive in evidence gruesome photographs designed primarily to arouse the passions of a jury, such photographs, even though unpleasant, are admissible when reasonably relevant to the issues before the court. Whether the probative value of such photographs outweighs their possible prejudicial effect is normally a question that rests in the sound discretion of the trial court. (*People* v. *Brubaker, supra,* 53 Cal.2d 37, 48; *People* v. *Carter,* 48 Cal.2d 737, 751 [312 P.2d 665] ; *People* v. *Cheary,* 48 Cal.2d 301, 312 [309 P.2d 431].) There was no abuse of discretion in the present case.

▮▮▮▮ It is also contended by appellant that the taking of saliva and blood samples from him violated his rights under the federal and state Constitutions in that they constituted an unreasonable search and seizure, and were cruel and inhuman within the meaning of *Rochin* v. *California,* 342 U.S. 165 [72 S.Ct. 205, 96 L.Ed. 183, 25 A.L.R.2d 1396]. Both samples were taken from appellant in order to determine whether he was of the group that could or could not have deposited the seminal fluid in the vaginal tract of Miss Hipperson. The record is completely silent as to the manner in which the saliva specimen was obtained. Certainly there is no evidence that force, in any degree, was used, or that appellant in any way objected to the taking of this specimen. As to the blood sample, the evidence shows that appellant was taken by the police to a hospital where he sat at a table while a nurse put a rubber tube around him arm and withdrew some blood with a hypodermic attached to a syringe. The record shows that at no time did appellant object to the taking of the sample or to the method employed to secure it. Certainly there is nothing in the record to indicate, nor is it contended, that the samples were taken in a fashion to shock the conscience or to offend our sense of justice. Under such circumstances the samples so secured were admissible in evidence. (*People* v. *Duroncelay,* 48 Cal.2d 766, 770 [312 P.2d 690] ; *Breithaupt* v. *Abram,* 352 U.S. 432 [77 S.Ct. 408, 1 L.Ed.2d 448] ; *People* v. *Haeussler,* 41 Cal.2d 252, 257 [260 P.2d 8].)

In concluding it should be noted that the trial judge, the Honorable Herbert V. Walker, at all times was most careful to protect the rights of appellant. The record also shows that

appellant was ably represented by his defense counsel, who at all times carefully protected appellant's legal rights. The prosecutor ably and fairly presented the case for the prosecution. The appellant undoubtedly was given a fair trial. The record is remarkably free from any procedural error.

The judgment and order are affirmed.

Gibson, C. J., Traynor, J., Schauer, J., McComb, J., White, J., and Dooling, J., concurred.

Appellant's petition for a rehearing was denied March 29, 1961.