Filed 9/17/15  P. v. Gutierrez CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D064791 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD236115) |
| ROLANDO IVAN GUTIERREZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Charles G. Rogers, Judge.  Affirmed.

Robert E. Boyce, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Annie Featherman Fraser, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Rolando Ivan Gutierrez (defendant) of the second degree murder of Hannah Podhorsky (Pen. Code, § 187, subd. (a))[1] and the attempted second degree murder of another victim (*id.*, at §§ 664, 187, subd. (a)) from a February 2009 shooting. As to both of these counts, the jury found true the following allegations: defendant committed the crimes as part of criminal street gang-related activities (§ 186.22, subd. (b)(1)); and defendant was a principal in the crimes, and in their commission at least one principal used a firearm, proximately causing a person's death (§ 12022.53, subds. (d) & (e)(1)).

In addition, from a domestic violence incident in August 2011, the jury convicted defendant of making a criminal threat (§ 422) and corporal injury resulting in a traumatic condition (§ 273.5, subd. (a)), but could not reach a verdict as to the attempted murder of Merith Duenas (§§ 664, 187, subd. (a)). As to the corporal injury count, the jury found true the allegation that defendant personally used a deadly and dangerous weapon, a knife (§§ 12022, subd. (b)(1), 1192.7, subd. (c)(23)).

The trial court sentenced defendant to prison for an indeterminate term of 65 years to life plus a consecutive determinate term of 10 years four months.

On appeal, defendant contends that the trial court abused its discretion in not severing the charges arising from the February 2009 shooting from the charges arising from the August 2011 domestic violence incident.

We will affirm.

---

[1]     Further undesignated statutory references are to the Penal Code.

I.

STATEMENT OF FACTS

We review the record and recite the facts in a light most favorable to the judgment. (*People v. Hill* (1998) 17 Cal.4th 800, 848-849.)

In February 2009, defendant shot a gun a number of times into a group of people, killing Hannah Podhorsky (at times, February 2009 shooting). In August 2011, defendant threatened to kill Merith Duenas, the mother of their child, and choked and cut her with a knife (at times, August 2011 domestic violence).

A.    *The February 2009 Shooting*

Witnesses at trial identified three gangs: the Wicked Clowns or "W.K" gang; the Stomping Klowns Around or "S.K.A." gang; and the Over Every Krew – 46th Street or "O.E.K. 46th Street" gang.[2] In 2009, the S.K.A. gang and the O.E.K. 46th Street gang were friendly, and the W.K. gang and the O.E.K. 46th Street gang were not.

Defendant and Juan Arredondo were members of the S.K.A. gang; Raymundo Hernandez, Jr., and Jesus Vargas were members of the O.E.K. 46th Street gang; and Angel Zamora and Podhorsky were members of the W.K. gang. In addition to the specific gang-related events we describe *post*, defendant and Zamora did not like each other personally, and there was an ongoing conflict or tension between them.

---

[2]    A "clown" is a "tagger"; a "crew" is a group of taggers; and a tagger is a someone who writes graffiti on walls.

Duenas met defendant through her friend, Brittany Roachford, in January 2009. When Duenas first met defendant, he and Roachford were in an on-again-off-again romantic relationship, and the three of them would drink and do drugs, along with others who claimed to be in the S.K.A. gang.

Beginning late in the day on January 31, 2009, and progressing into the early morning hours on February 1, 2009, there were a number of confrontations between a group from the W.K. gang and another group from the O.E.K. 46th Street and the S.K.A. gangs.

A group of people associated with the W.K. gang, including Podhorsky, were at a party at the residence of Juan Meza;[3] Zamora and two others left the party in Zamora's Nissan Xterra to get more beer; they drove by defendant's home, where a group of people were gathered, including defendant and Vargas; words were exchanged; when the Xterra returned, again driving by defendant's home, the W.K. gang members threw gang signs; and Vargas responded by throwing a rock that broke the window of Zamora's Xterra. Zamora felt disrespected; thus, after Zamora told the others at the Meza residence what had happened, a group of them, including Podhorsky, got back into the Xterra and returned to defendant's house. They parked in an alley close to defendant's house.

Meanwhile, Hernandez had been with friends at a house where O.E.K. 46th Street gang members often spent time. He left that house to attend a family birthday party for

_____

3    Meza was not a gang member. The people at the party included Meza's brother and a group of his friends, most of whom associated with the W.K. gang.

4

the parent of a friend who lived down the street — near the alley where Zamora and the other W.K. gang members had parked. While Hernandez and the guests were in the back yard at the birthday party, Hernandez heard the break of glass, and a group from the back yard went out front and saw the broken window of the car of one of the birthday party guests. Once out front, the group from the party saw the six or seven people from the Zamora group (W.K. gang) on the street running toward the back of the house through the alley. At that point, the two groups — i.e., the Zamora group and the birthday party group — had a physical and verbal confrontation in the alley: fists, rocks and a bat were used, and Hernandez screamed out the name of his gang (O.E.K. 46th Street). The police arrived, and the members of the Zamora group split up and ran in various directions. After the police left, three of the W.K. gang members (including Zamora and Podhorsky) returned, got into the Xterra and drove back to the Meza residence, where the W.K. gang had been partying earlier.

After the melee in the alley, Hernandez returned to the house where he had been earlier that night before the birthday party. On the front sidewalk, he saw defendant and Vargas and told them what had just happened at the birthday party. Within minutes Roachford and Duenas drove up, having received a call shortly after midnight (now February 1) from defendant who needed a ride; defendant had told Roachford that he was concerned he was going to "get jumped." Although the record is not clear, we understand from Duenas's testimony that, on their way to pick up defendant, Duenas and Roachford drove by defendant's house, where they saw a group of people yelling and throwing rocks

5

and sticks at the house. As defendant, Hernandez, Vargas, Arredondo,[4] Duenas and Roachford all drove away together, defendant told the others about the earlier altercation with Zamora and the Xterra in front of defendant's house. Defendant stated that he "wanted to get" Zamora, because he thought Zamora had disrespected him during the events leading up to the earlier altercation. Hernandez understood defendant to mean that he wanted to fight Zamora.

They drove a few blocks, stopping briefly at the house of a friend of defendant. The friend handed defendant a gun wrapped in a bandana and told defendant to " 'do it for 46th.' " They then drove to various locations looking for Zamora. Defendant and Hernandez would get out of the car, look around and return to the car.[5] As they were driving around, they saw Zamora's Xterra and followed it. By this point in time, defendant had a gun and had given Hernandez the gun in the bandana.[6] Zamora parked the Xterra in the driveway of the Meza residence, and Arredondo parked the other car on the street a few houses away.

---

[4]     The testimony is conflicting as to whether, when Duenas and Roachford arrived, Arredondo was on the street with defendant, Hernandez and Vargas or in the car with Duenas and Roachford. This conflict in evidence does not affect our analysis of the issue on appeal.

[5]     Arredondo (the driver), Vargas (who was drunk and had passed out in the back seat), Duenas and Roachford (who were both scared) remained in the car.

[6]     The record does not disclose where defendant's gun came from, although Duenas testified that Vargas had displayed a gun in the car as they were driving around looking for Zamora.

6

Defendant asked Hernandez if he was " 'ready,' " which Hernandez understood to mean ready to "go shoot somebody." Zamora, Podhorsky and their friend were in the front yard of the Meza residence, as defendant and Hernandez got out of the car, each wearing a "hoodie" that covered his head and carrying a gun. As defendant and Hernandez walked up the sidewalk, Zamora heard someone yell " 'Fuck W.K.,' " followed by sound of gunshots. According to Hernandez, defendant stopped, raised his gun and shot it at least two times, and he (Hernandez) ran, never even trying to shoot his gun.

Two bullets passed entirely through Podhorsky's body. Podhorsky died from a gunshot wound to her torso.

B.    *The August 2011 Domestic Violence*

A few months after the February 2009 shooting, defendant and Duenas entered into a personal relationship, and they had a child together in February 2010. Their relationship was a physically violent one.

On August 15, 2011, Duenas was at work, and her friends Bethany Fletcher and Leslie Lepe were at Duenas's house with Duenas's eight-year-old sister and Duenas's one-and-a-half-year-old child. Lepe called Duenas to tell her that defendant had come to the house and threatened to kill Lepe and Fletcher. Duenas immediately left work, and when she arrived at home, Lepe told Duenas that defendant's threat also included a return visit to kill her (Duenas).

As her friends were telling Duenas in more detail what had happened earlier, defendant returned. He entered the house by jumping a fence to avoid a locked gate and

7

opening a sliding glass door. Defendant and Duenas argued, during which time defendant called Duenas a bitch, threatened to kill her, pulled out and opened a knife, cut her on her stomach, pushed her down to the ground and choked her with his hands. After defendant cut Duenas with the knife (and before he choked her), Lepe grabbed Duenas's child from Duenas, who had been holding the child throughout this ordeal. Duenas thought defendant was going to kill her, fully believing he was capable of doing so.

When Fletcher ran outside to call 911, defendant chased after her and pushed her into the bushes in his attempt to take her telephone. Defendant then left, threatening to kill all of them. Fletcher completed the 911 call, and the authorities arrived.

In addition to telling the authorities about the domestic violence events of that day, due to her fear of defendant — "I just thought he was going to kill me, too. I believed he was capable of it." — Duenas also told them what she knew about the February 2009 shooting. The authorities immediately placed Duenas in a battered women's shelter, eventually placing her in a witness protection program.

## II.

## STATEMENT OF THE CASE

The People filed their original information in June 2012. With regard to the February 2009 shooting, defendant was charged with murder and attempted murder (original counts 1 and 2, respectively; at times, the murder counts). With regard to the August 2011 domestic violence, defendant was charged with attempted murder, assault with a deadly weapon likely to cause great bodily harm, making a criminal threat, corporal injury, first degree burglary and attempting to dissuade a witness from reporting

8

a crime (original counts 3 through 8, respectively; at times, the domestic violence counts).[7]

In July 2012, defendant moved to sever the murder counts from the domestic violence counts. The People opposed the motion. After oral argument, the court denied the motion, reasoning that the facts relating to the domestic violence counts were "inextricably intertwined" with the People's proof on the murder counts — including specifically Duenas's credibility as a critical witness on the murder counts.

During in limine proceedings at which the court was asked to decide whether to admit uncharged acts of defendant's violence in support of the domestic violence counts (Evid. Code, § 1109), defendant orally renewed his motion to sever. In a written order, the court allowed some and disallowed other evidence of the uncharged acts and denied the renewed motion to sever, ruling that the decisions on the admissibility of uncharged acts did not change the court's earlier analysis and order denying severance.

The case went to trial on the murder and attempted murder charges from the February 2009 shooting and the attempted murder, criminal threat and corporal injury charges from the August 2011 domestic violence. With regard to the February 2009 shooting, the jury convicted defendant of second degree murder and attempted second degree murder, finding true the allegations that defendant committed the crimes as part of

---

7    The amended (July 2013) information, on which defendant went to trial, contained five of the original eight original counts. The amended information did not contain the following three charges from the August 2011 domestic violence: assault with a deadly weapon likely to cause great bodily harm, first degree burglary and attempting to dissuade a witness from reporting a crime (original counts 4, 7 and 8, respectively).

criminal street gang-related activities, was a principal in the crimes and in their commission at least one principal used a firearm, proximately causing a person's death. With regard to the August 2011 domestic violence, the jury convicted defendant of making a criminal threat and corporal injury resulting in a traumatic condition, finding true the allegation that defendant personally used a deadly and dangerous weapon; the jury could not reach a verdict as to the attempted murder of Duenas.

Following sentencing on October 18, 2013, defendant timely appealed.

III.

DISCUSSION

In this appeal, defendant argues that the trial court abused its discretion in denying severance of the murder counts from the domestic abuse counts.  We are not persuaded.

A.    *Law*

Our Constitution "shall not be construed by the courts to prohibit the joining of criminal cases as prescribed by the Legislature . . . ."  (Cal. Const., art. I, § 30, subd. (a).) In this regard, our Legislature enacted section 954, which provides in relevant part:

> " An accusatory pleading may charge . . . two or more different offenses of the same class of crimes or offenses, under separate counts, . . . provided, that the court in which a case is triable, in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately or divided into two or more groups and each of said groups tried separately."

" ' "The law prefers consolidation of charges" ' " (*People v. Smith* (2007) 40 Cal.4th 483, 510), because a "joint trial 'ordinarily avoids the increased expenditure of funds and judicial resources which may result if the charges were to be tried in two or more separate

10

trials' " (*People v. Soper* (2009) 45 Cal.4th 759, 772 (*Soper*)).  A single trial of two different offenses promotes efficiency by requiring only one courtroom, one judge (and staff), one group of jurors and one appeal — and the time associated with only one proceeding in the trial and appellate courts.  (*Ibid.*)

When confronted with a severance request, the trial court's first inquiry is whether the two offenses are "of the same class of crimes or offenses."  (§ 954; see *Soper*, *supra*, 45 Cal.4th at p. 771.)  Even where this statutory requirement for joinder is satisfied, however, "in the interests of justice and for good cause shown" (§ 954), the court nonetheless should order severance where the defendant establishes "a substantial danger of prejudice requiring that the charges be separately tried" (*Soper*, at p. 773; see *People v. Thomas* (2012) 53 Cal.4th 771, 798 (*Thomas*) [" 'a clear showing of prejudice' " is required]).  In considering a defendant's showing of prejudice for this purpose, the trial court must assess the following factors:  "whether the evidence is cross-admissible in separate trials; whether some of the charges are likely to inflame the jury; whether a weak case has been joined with a strong case so that a 'spillover' effect might affect the outcome; and whether one of the joined charges is a capital crime."  (*People v. Valdez* (2004) 32 Cal.4th 73, 120 (*Valdez*).)

In an appeal from the denial of severance, we consider the record that was before the trial court at the time of the ruling, not the evidence or arguments that may have developed later.  (*Thomas*, *supra*, 53 Cal.4th at p. 798.)  We review the trial court's ruling for an abuse of discretion, which in this context means a ruling that " ' " 'falls outside the bounds of reason.' " ' "  (*People v. Jenkins* (2000) 22 Cal.4th 900, 947 (*Jenkins*).)  The

11

appellant has the burden of establishing a prejudicial abuse of discretion in the denial of a severance motion. (*People v. Balderas* (1985) 41 Cal.3d 144, 171.)

B.    *Analysis*

Defendant first argues that the court erred in denying severance under section 954 during the *pretrial proceedings*. Defendant then argues that, even if the court did not err in denying severance, he nonetheless suffered prejudice *at trial* as a result of the joinder of the charges.

1.    *Defendant Did Not Meet His Burden of Establishing That the Trial Court Abused its Discretion in Denying Severance*

There is no issue on appeal with regard to whether the murder counts and the domestic violence counts are "of the same class of crimes or offenses" (§ 954), which means " ' "offenses possessing common characteristics or attributes" ' " (*People v. Kemp* (1961) 55 Cal.2d 458, 476). Defendant made no showing to the contrary in his opening brief, the People persuasively argue that both sets of charges are of the same class — namely, assault — and in reply defendant concedes that they "are of the same class and permissibly joined under section 954."

We now turn to defendant's showing of prejudice in the context of the four factors (1) whether the evidence from the domestic violence counts would be cross-admissible in separate trials, (2) whether some of the charges might inflame the jury, (3) whether the People joined a weak case with a strong case to such an extent that a spillover effect might affect the outcome, and (4) whether one of the joined charges is a capital crime. (*Valdez, supra*, 32 Cal.4th at p. 120.) Not all of these factors are of equal weight; we are

12

to look *first* whether the evidence is cross-admissible. If " ' "evidence on each of the joined charges would have been admissible, under Evidence Code section 1101, in separate trials on the others," ' " then " ' "*any inference of prejudice is dispelled*." ' " (*Jenkins*, *supra*, 22 Cal.4th at p. 948, italics added.) Thus, cross-admissibility of the evidence " 'suffices to negate prejudice' " without a further showing. (*Ibid.*)

Here, the court did not abuse its discretion in ruling that, because Duenas was a critical witness on the murder counts and thus her credibility would be at issue, the evidence relating to the domestic violence counts was "inextricably intertwined" with the evidence on the murder counts. Because neither side submitted *evidence* in support of or in opposition to either the written or oral motion, the court necessarily relied on argument.

In the written opposition, the People argued:

"[E]vidence of Defendant Gutierrez['s domestic violence] attack on Ms. Duenas would be independently relevant to the murder charges insofar as it explains why Ms. Duenas revealed what she knew to the police nearly 2½ years after [the shooting] occurred. Furthermore, the crimes from 2011 would be independently relevant to fully explain and justify the witness protection efforts made and resources expended on Ms. Duenas."

Consistently, at the hearing, the district attorney orally argued:

"[E]vidence of Merith Duenas's violence at the hands of defendant Gutierrez will come in in a trial on [the murder counts] . . . .

"It is and can only be described as significantly relevant to her state of mind both at the time she was making the statement to the cops immediately following her report of injury done to her by defendant Gutierrez, as well as highly relevant to her fear of him, her state of mind now as she testifies, and her potential prejudices or biases against him.

13

"This is a case in which her testimony . . . will be carefully scrutinized by the jury. . . . [T]hey will wonder what made her do this so far after the event. She did not immediately report. This occurred two years after she should have reported. Why did she all of a sudden report? Why should we believe her now that she's coming forward and talking to the police?

"*And that question can only be answered and the jury can only be fairly apprised of the actual circumstances if, in fact, . . . the* [*jury that hears the murder charges*] *learns of the circumstances of her discussion with the police on August 15, 2011, which is after she was attacked by defendant Gutierrez.*"  (Italics added.)

Significantly, defendant does not argue that this showing was inadequate to establish the cross-admissibility of the evidence of the domestic violence.  Rather, he argues only that the premise of the People's argument — namely, that Duenas did not come forward for two and a half years because of her fear of violence by defendant — was faulty.  Relying on Duenas's recorded interview with the police on August 15, 2011 (the date of the domestic violence), defendant explains that Duenas did not come forward after the shooting because she feared she would be charged and sent to prison, not because she was afraid of defendant.  On appeal, defendant quotes from portions of Duenas's recorded interview that support his contention on appeal.  Defendant's argument fails for two reasons.  First, the parties did not submit the transcript to the trial court with their written submissions, and there is no indication that the court otherwise had before it Duenas's recorded interview,[8] yet we must review the court's decision based only on

---

8    Our only knowledge of the recorded statement is that it is in the record on appeal as having been introduced *at trial* as exhibit 32.

14

what it knew *at the time of the ruling* (*Thomas*, *supra*, 53 Cal.4th at p. 798).[9] Moreover, even if we assume the court had read and considered the recorded interview, in addition to those portions on which defendant relies, Duenas's statement also contains substantial evidence in support of the court's ruling on cross-admissibility — namely, Duenas's genuine concern for her safety and that of her child, and specifically her fear of defendant, given his violent behavior toward her.

Having found no abuse of discretion in the trial court's ruling in response to defendant's written pretrial motion, we next consider defendant's renewed motion to sever. Defendant orally renewed his motion during the in limine proceedings at which the court decided whether uncharged acts of domestic violence against Duenas would be admissible under Evidence Code section 1109. Following the hearing, the court issued a written ruling, allowing evidence of three uncharged acts, disallowing two uncharged acts, and ruling as following on defendant's renewed request to sever:

> "The court does not believe that the foregoing ruling on the admissibility of [the evidence on the three] uncharged acts [] going to [the domestic violence counts] materially changes its previous analysis and ruling on the earlier motion to sever these counts. An appropriate limiting instruction is invited, and it seems highly likely that the trial of [the murder counts], even if severed, would involve evidence of the tumultuous relationship between Merith Duenas and defendant."

We agree. The admissibility of three uncharged acts of domestic violence, especially with an appropriate limiting jury instruction, does not change the court's earlier ruling that the evidence of domestic violence was "inextricably intertwined" with the evidence

---

9    For this same reason, we do not consider the arguments in defendant's opening brief based on the opening statements or closing arguments at trial.

15

on the murder counts and, thus, cross-admissible. Once again, the court did not abuse its discretion.

Because the court properly determined, on the pretrial record before it, that the evidence in support of the domestic violence counts would be admissible against defendant in a separate trial on the murder counts, we are satisfied that " ' "*any inference of prejudice is dispelled.*" ' " (*Jenkins*, *supra*, 22 Cal.4th at p. 948, italics added.) Accordingly, we need not consider the other three factors that may establish prejudice. (*Ibid.* [cross-admissibility without more " 'suffices to negate prejudice' "].)

For these reasons, defendant did not meet his burden of establishing error in the denial of the motions to sever.

2.    *Defendant Did Not Meet His Burden of Establishing Prejudice at Trial*

Defendant argues that, even if the trial court did not err in denying his pretrial requests to sever the murder counts from the domestic violence counts, the joinder of the charges at trial resulted in prejudice — i.e., " ' "in gross unfairness depriving [the] defendant of due process," ' " quoting from *Soper*, *supra*, 45 Cal.4th at page 783. In so arguing, defendant again focuses on strength of the evidence in support of the domestic violence charges,[10] including the evidence of the uncharged acts of violence admitted

10    At oral argument, counsel suggested that, at trial, the court could have limited the extent of the evidence of domestic violence in order to avoid any " 'spillover' effect" that such evidence had on the outcome of the gang-related murder charges. (See *Valdez, supra,* 32 Cal.4th at p. 120.) We decline to consider this contention, because: (1) counsel raised it for the first time at oral argument (*People v. Crow* (1993) 6 Cal.4th 952, 960, fn. 7); and (2) counsel was unsure whether trial counsel had made such a request in the trial court, and we are aware of none. In any event, we question defendant's description of the strength or extent of the evidence of domestic violence,

pursuant to Evidence Code section 1109, and on what he contends is the weakness of the evidence in support of the murder charges. We are not convinced.

For purposes of this analysis, we must assume that the evidence in support of the domestic violence charges would not have been admissible in a separate trial on the murder charges. (*Soper*, *supra*, 45 Cal.4th at p. 783.) In so doing, however, there will be no prejudicial effect from the joinder of charges " ' "when the evidence of each crime is simple and distinct, even though such evidence might not have been admissible in separate trials." ' " (*Id.* at p. 784.)

Even without consideration of defendant's acts of domestic violence, the evidence of defendant's guilt of murder of Podhorsky and attempted murder of another was strong. Defendant had a longstanding feud with Zamora; and defendant's gang, the S.K.A. gang, did not get along with Zamora's (and Podhorsky's) gang, the W.K. gang. After Zamora, Podhorsky and their friend returned to the Meza residence, parked the Xterra in the driveway and were standing in the front yard, *five eyewitnesses* saw defendant and Hernandez — each with a gun — walk toward the Meza residence as gunshots were heard and sparks of light were seen. *One eyewitness* saw defendant shoot his gun, and *another eyewitness* was "pretty sure" she saw defendant shoot his gun. When defendant

_____

given that the jury could not reach a verdict on the domestic violence attempted murder charge.

17

and Hernandez returned to their car, Hernandez had not fired his gun. As she stood in the front yard of the Meza residence, Podhorsky was shot twice.[11]

In contrast, defendant presented an alibi defense, the only evidence of which came from defendant's 18-year-old brother (who was 13 at the time of the February 2009 shooting). The brother testified that he and defendant shared a bedroom and that, when the brother went to bed at 12:30 a.m., a few hours before Podhorsky's killing, defendant was already in home in bed, and they woke up together at around 5:00 a.m. a few hours after Podhorsky's killing. Although defendant emphasizes that his brother's testimony was "compelling and unimpeached" (and tells us all the reasons the prosecution witnesses were not credible and how well they had been impeached on cross-examination), the jury was not required to give the brother's testimony any special consideration (or the People's witnesses any less consideration). The jury was instructed properly according to CALCRIM No. 226, in part as follows:

> "*You may believe* all, or part or *none of any witness's testimony*. Consider the testimony of each witness and decide how much of it you believe.
>
> "In evaluating a witness's testimony you may consider anything that reasonably tends to prove or disprove the truth or accuracy of that testimony. Among the factors that you may consider are these: [¶] . . . [¶] Was the witness's testimony influenced by a factor such as bias or prejudice, *a personal relationship with someone involved in the case*, or a personal interest in how the case is decided?" (Italics added.)

---

[11] Another witness testified that, within two days of the February 2009 shooting, Duenas told her all of the details of the shooting — details that were consistent with Duenas's trial testimony.

Thus, the jury was entitled to consider the familial relationship between defendant and his alibi witness in assessing the alibi defense that defendant proffered through his brother's testimony.

In closing, defendant argues that the introduction of evidence of domestic violence — both the charged acts and the uncharged acts — was so prejudicial that it violated his federal constitutional rights to due process, rendering the trial fundamentally unfair. (See *People v. Partida* (2005) 37 Cal.4th 428, 439 [admission of evidence, regardless whether erroneous under state law, is a federal due process violation "only if" it results in a fundamentally unfair trial].) "To prove a deprivation of federal due process rights, [an appellant] must satisfy a high constitutional standard to show that the erroneous admission of evidence resulted in an unfair trial. 'Only if there are *no permissible inferences the jury may draw from the evidence* can its admission violate due process.' " (*People v. Albarran* (2007) 149 Cal.App.4th 214, 229, italics added.) Defendant did not meet this high constitutional standard.[12]

Defendant contends that the jury was "not limited in the manner they could consider the evidence of the *charged* counts of domestic violence" — suggesting that a jury cannot be expected "to compartmentalize the evidence . . . when they are not told to do so." We disagree. In the trial of the murder counts, the jury could permissibly infer

---

[12] We note that defendant did not mention in his briefs, let alone develop arguments based on, the federal constitutional standard — in violation of California Rules of Court, rule 8.360(a) and 8.204(a)(1)(B). We nonetheless exercise our discretion to consider this potentially serious issue.

from the evidence of the charged counts of domestic violence both Duenas's credibility and the reason for her delay in reporting.[13]

For the first time in his reply brief, in the context of the *uncharged* acts of domestic violence and CALCRIM No. 852, defendant contends that "the jury was told they [*sic*] could consider the domestic violence to conclude that [defendant] had a propensity to commit acts causing serious bodily injury, i.e.[,] murder and attempted murder, as charged in counts 1 and 2." Defendant forfeited this claim by not raising it in his opening brief. (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 408.) In any event, we further reject the argument on the basis that, in presenting it, defendant misrepresents the record in describing what the jury was told insofar as considering the uncharged acts of domestic violence. Contrary to defendant's presentation quoted *ante*, the jury was told *both* that it could (but was not required to) consider the uncharged acts of domestic violence for purposes of determining guilt in "counts 3, 4 and/or 5 as charged in this case" *and* that it could "not consider this evidence for any other purpose," which includes the murder charges in counts 1 and 2. (See CALCRIM No. 852.) We presume, and defendant does not argue otherwise, that the jury understood and followed this instruction. (*People v. Johnson* (2015) 61 Cal.4th 734, 770.)

---

13    To the extent defendant's argument is that the jury should have been instructed as to its consideration of the *charged* counts of domestic violence in deciding the murder counts, defendant forfeited this argument by not raising it in the trial court in the first instance. (*People v. Riggs* (2008) 44 Cal.4th 248, 309 [appellant forfeits challenge to completeness of instructions "by failing to request clarifying or amplifying language"].)

DISPOSITION

The judgment is affirmed.

IRION, J.

WE CONCUR:

NARES, Acting P. J.

HALLER, J.