Filed 11/5/21  P. v. Barraza CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

|  |  |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ELOY MELERO BARRAZA,<br><br>Defendant and Appellant. | F078691<br><br>(Super. Ct. No. 4002299)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Stanislaus County.  Edward M. Lacy, Jr., and Joseph R. Distaso, Judges.[*]

Elizabeth J. Smutz, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Darren K. Indermill and Kari Ricci Mueller, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]     Judge Lacy presided over the consolidation motion hearing; Judge Distaso presided over all other hearings pertinent to this appeal.

Appellant Eloy Melero Barraza was charged in two separate accusatory pleadings with offenses committed against his estranged wife, on two separate occasions. Before trial, the court granted the prosecutor's motion to consolidate the accusatory pleadings.

Following a jury trial on the consolidated charges, appellant was convicted of battery on a spouse or cohabitant (Pen. Code,[1] § 273.5, subd. (a); count I) and assault with a stun gun or taser (§ 244.5, subd. (b); count II) arising from the first incident; and first degree robbery (§ 212.5, subd. (a); count III) and first degree burglary (§ 459, subd. (1); count IV) arising from the second incident. As to count I, the jury found true that appellant personally used a deadly or dangerous weapon in the commission of the offense (§ 12022, subd. (b)). As to counts III and IV, appellant admitted he committed the offenses while released on bail (§ 12022.1).

Appellant was sentenced to a three-year term on count III, a concurrent two-year term on count I, a consecutive two-year term for one of the on-bail enhancements, and a concurrent one-year term for the deadly or dangerous weapon enhancement. The trial court stayed punishment on counts II and IV and the remaining on-bail enhancement pursuant to section 654. Appellant's total prison term was five years.[2]

Appellant raises one issue on appeal: that the court reversibly erred by granting the prosecutor's pretrial motion to consolidate the accusatory pleadings for counts I and II with counts III and IV.

Finding no error, we affirm.

---

[1]    Further undesignated statutory references are to the Penal Code.

[2]    In his opening brief, appellant states the trial court has since corrected appellant's sentence in response to a letter from the California Department of Corrections and Rehabilitation. According to appellant, the trial court imposed the three-year term for count III, plus a consecutive term of eight months for count II (one-third the midterm) plus a single two-year on-bail enhancement, for a total of five years eight months.

## RELEVANT PROCEDURAL BACKGROUND

On January 30, 2017, a complaint was filed charging appellant with offenses arising from an incident occurring on January 2, 2017 (January incident), where he allegedly placed a stun gun against his wife's neck. The complaint alleged appellant committed battery on a spouse or cohabitant (§ 273.5, subd. (a)) against Virgilia S.[3] It was further alleged as to the battery count that he personally used a deadly or dangerous weapon, to wit, a stun gun (§ 12022, subd. (b)). The complaint further alleged appellant committed assault with a stun gun or taser (§ 244.5, subd. (b)). Appellant was released on bail after posting a bond.

On May 3, 2017, a complaint was filed charging appellant with offenses arising from an incident occurring on March 2, 2017 (March incident), where he allegedly entered Virgilia's home and took her cell phone from her. The complaint alleged appellant committed first degree robbery against Virgilia (§ 212.5, subd. (a)) and a misdemeanor violation of a court order (§ 273.6, subd. (a)). As to the robbery count, it was further alleged appellant committed the offense while out on bail (§ 12022.1).

A preliminary hearing was held on both complaints with no objection from the defense on January 26, 2018. Virgilia testified as to each incident, and two police officers testified, one for each incident. Following the hearing, the court held appellant to answer to felony battery on a spouse or cohabitant and use of a deadly or dangerous weapon, assault with a stun gun or taser, and first degree robbery, as well as first degree burglary though at the time it was uncharged. The court did not hold appellant to answer to the violation of a court order charge because the prosecution had not introduced a certified copy of the order.

---

[3] We refer to Virgilia and her minor daughter, Michelle S., using their first names in the interest of their privacy. No disrespect is intended.

An information for each case was filed on February 9, 2018. The information filed in connection with the January incident set forth the same charges and enhancements as the previously filed complaint. The information filed in connection with the March incident charged appellant with first degree robbery (§ 212.5) and first degree burglary (§ 459). For each charge relating to the March incident, the information alleged appellant committed the offense while released on bail (§ 12022.1).

On July 20, 2018, the prosecutor filed a motion to consolidate the accusatory pleadings for the January and March incidents alleging the pleadings "charge[d] crimes of the same class" of "domestic violence." Appellant opposed the motion, arguing the offenses were not "of the same class" and that appellant would be prejudiced if the court granted the motion.

The court conducted a hearing on the motion on August 29, 2018, and granted the prosecutor's motion to consolidate. The court concluded "from the allegations and the offenses that the robbery well could be considered a domestic violence offense with [appellant] having allegedly entered [the] victim's home, she was sleeping, grabbed a phone from her in a manner, did not physically assault her, caused her fear." The court noted with regard to appellant's argument he planned to impeach Virgilia's testimony, "that works both ways. If the defense were able to severely damage the victim's credibility in one case, that could very well carry over to the other. Of course, it could go the other way too."

The prosecutor filed a first amended information alleging all four counts and all enhancements on September 7, 2018. Trial commenced in October 2018.

## FACTS ADDUCED AT TRIAL

*Prosecution Case*

Virgilia and appellant were in a cohabitating relationship for eight years; for four of those, they were married. They had a young daughter, Michelle S., who was in the

4.

fifth grade at the time of the trial. Appellant and Virgilia separated on December 15, 2016, at which point Virgilia moved out of the house they shared.

On the morning of January 2, 2017, appellant went to Virgilia's house to drive her and Michelle to Michelle's school in order to enroll her. A few minutes into the drive, appellant told Virgilia he bought a "lamp" and then proceeded to retrieve a stun gun from the driver's door. Appellant put the stun gun against Virgilia's neck, and she felt a painful electric shock. Appellant angrily asked Virgilia what it felt like. Michelle saw "blue little things" come out of the stun gun when appellant put it against Virgilia's neck. Appellant stopped the car and grabbed Virgilia's hand and tried to bend it downward. Michelle exited the vehicle.

A couple in the neighborhood woke up to Michelle screaming, "he shot her with a laser" and "[h]elp, he's killing her," "[h]e's killing my mom," and they both ran outside. The husband observed appellant dragging Virgilia into the car through the passenger side front door and Virgilia struggling to get out. Eventually, Virgilia was able to exit the car and both she and Michelle went into the neighbors' home. The husband tried talking to appellant, but appellant yelled that he did not do anything and left the scene. Both the husband and wife saw two dots on Virgilia's neck. The wife called 911 and reported Virgilia had been "stunned by her … husband with a stun gun." Virgilia testified that after this incident, she was afraid to go to work or leave the house.

Officer Benito Chavez responded to Virgilia's place of employment a few hours after the incident to interview her. Virgilia told him what happened and that appellant had accused her of cheating on him. After her conversation with Chavez, Virgilia sought an emergency protective order.

Chavez further testified Virgilia's description of the weapon appellant used was consistent with stun guns he had seen. He further testified stun guns can be dangerous as they "deliver a pretty good shock," which is painful and "can burn the skin."

5.

Appellant turned himself in to the sheriff's department on January 26, 2017. Appellant was arrested and told police he and Virgilia got into a verbal argument regarding her cheating on him but that the argument did not get physical. Appellant denied ever owning or using a stun gun on Virgilia or anyone else.

At approximately 3:30 a.m. on March 2, 2017, Virgilia heard someone opening the door to her bedroom where she was sleeping with Michelle. She turned on her cellphone flashlight and realized it was appellant. Michelle also woke up and saw appellant. Appellant ran toward Virgilia and grabbed the phone from her hand. She tried to pull it back but he took it away from her after a brief struggle. Michelle was kicking appellant while he was struggling with Virgilia over the phone. Appellant took off running and Virgilia saw through the kitchen window he had left out the backdoor into a nearby alley. She had not seen him since the January incident. She was afraid he was going to beat her. She called 911 approximately five to 10 minutes after he left to report the incident, after she was able to borrow a phone from one of her housemates. Virgilia testified appellant had given her the phone in November before they separated.

Virgilia further testified she understood a "U-Visa" to be a visa given to victims of domestic violence. She first heard about it after the January incident from the help center to which the police referred her and applied for one in April 2017.

### Defense Case

Appellant testified in his defense. He testified Virgilia had asked him several times throughout their relationship to help her apply for a visa but she was never able to gain legal status in the United States.

As to the January incident, appellant testified that on January 2, 2017, Virgilia had asked him for a ride and he brought she and Michelle breakfast when he picked them up. Appellant asked Virgilia about getting back together, but she told him she was with someone else. Appellant called Virgilia a "B word" and they started arguing. Virgilia scratched him in the side and he "got her" by the neck and started pulling the car over.

6.

They got into a physical altercation. Appellant stated he had never owned or possessed a stun gun and did not use one on Virgilia.

Appellant's sister, Elisa Blandino, testified that Virgilia called her the day after the January incident and told her she and appellant had had an argument and had hurt each other. Virgilia did not further elaborate or indicate appellant had used a stun gun on her. Blandino further testified Virgilia had asked Blandino approximately four or five years ago about getting her legal residency. Shortly after the January incident, Virgilia told Blandino if she pressed charges, she would have a better chance of "becoming legal in the U.S." Appellant told Blandino about the January incident that Virgilia got upset and he had to pull the car over because she was hurting him.

As to the March incident, appellant testified that on March 1, 2017, Virgilia contacted appellant and told him she needed money for Michelle's birthday. Appellant asked her during this conversation if she still wanted the phone he had given her because he knew she did not like it. He and Virgilia agreed she would leave the phone on a table on her front porch for him to take, and he would leave the money there. Appellant went to Virgilia's house around 6:00 p.m. that evening and she was home, so they exchanged the money and the phone in person. He stayed approximately 10 to 15 minutes. Appellant denied entering Virgilia's home at 3:00 or 4:00 a.m. on March 2.

Private investigator Richard Paloma testified he had reviewed appellant's Google account, which tracks the location of his cell phone, and it corroborated appellant's testimony regarding his whereabouts on March 1 and 2.

***Prosecution Rebuttal***

Virgilia testified appellant gifted her the phone as incentive for her to leave the house when they separated. Virgilia denied hitting or scratching appellant on January 2. She further testified that in March 2016 appellant threw a perfume bottle in Virgilia's face and, thereafter, threw another perfume bottle down around Michelle's feet where it

7.

shattered. Appellant then attempted to punch Virgilia in the face, but she blocked it with her arm.

*Defense Surrebuttal*

Blandino testified Virgilia never told her of an incident where appellant punched her, and she had never known appellant to be a violent person.

## DISCUSSION

Appellant contends the trial court erred by granting the prosecution's motion to consolidate. As a threshold matter, appellant argues the charges arising from the incidents did not meet the statutory requirements of section 954 such that consolidation was proper as a matter of law. He next argues that even if the charges could be properly joined, he demonstrated prejudice, rendering the trial court's order an abuse of discretion. Finally, he contends even if the trial court did not abuse its discretion at the time it granted the prosecution's motion, the consolidation of the charges resulted in "gross unfairness" in violation of appellant's due process rights. We reject appellant's claims.

## I. Propriety of Joinder as a Matter of Law

Whether offenses are properly joined pursuant to section 954 is a question of law and is subject to independent review on appeal. (*People v. Westerfield* (2019) 6 Cal.5th 632, 686.)

A court may order two or more accusatory pleadings to be consolidated when the offenses are "connected together in their commission" or are of "the same class of crimes or offenses." (§ 954.) Section 954 " 'permits the joinder of different offenses, even though they do not relate to the same transaction or event, if there is a common element of substantial importance in their commission, for the joinder prevents repetition of evidence and saves time and expense to the state as well as to the defendant.' " (*People v. Armstrong* (2016) 1 Cal.5th 432, 455.) " ' "The law prefers consolidation of charges." ' " (*People v. Smith* (2007) 40 Cal.4th 483, 510.)

8.

Even offenses " ' " 'committed at different times and places against different victims are nevertheless "connected together in their commission" when they are … linked by a " 'common element of substantial importance.' " ' " ' " (*People v. Westerfield*, *supra*, 6 Cal.5th at p. 686.) "Motive or intent may be such a common element of substantial importance." (*Ibid.*) For example, intent to illegally obtain property can constitute a common element of substantial importance. (*People v. Anderson* (2018) 5 Cal.5th 372, 388.)

Courts have consistently interpreted "of the same class" to mean possessing common characteristics or attributes. (*People v. Kemp* (1961) 55 Cal.2d 458, 476; *Aydelott v. Superior Court* (1970) 7 Cal.App.3d 718, 722; *People v. Frank* (1933) 130 Cal.App. 212, 216.) For example, charges of attempted murder, robbery, and possession of a weapon by an ex-felon may be joined because they all involve "assaultive" crimes. (*People v. Thomas* (1990) 219 Cal.App.3d 134, 140–141.)

Applying the above principles, we conclude the offenses here met the statutory requirements for joinder. They had a "common element of substantial importance" as they were committed against the same victim—appellant's former intimate partner—and both incidents occurred shortly after their separation and within two months of one another. Moreover, the crimes qualified as the "same class" as they shared common characteristics or attributes—they were acts of aggression against the person and home of the same former partner and could all be classified as crimes of domestic violence. Appellant objects to the classification of the crimes as domestic violence crimes. However, evidence of the offenses was cross-admissible as acts of domestic violence pursuant to Evidence Code section 1109, as we explain in more detail below, which supports our conclusion the offenses here were of the "same class" as a matter of law.

Appellant further takes the position that because not all crimes could be considered "assaultive" crimes, joinder was not proper. We reject appellant's analysis. First, whether the crimes were all "assaultive" is not the only factor to be considered. As

9.

we have explained above, there were a number of common characteristics which persuade us that joinder was proper in this case.

Second, we disagree with appellant's characterization of the offenses. To reach his conclusion, he describes the offenses in the March incident as "theft crimes against property"; this substantively minimizes the circumstances of the March offenses. As for robbery, the California Supreme Court has described robbery as a "crime of violence committed against a person" (*People v. Scott* (2009) 45 Cal.4th 743, 749) and an " 'assaultive crime[] against the person' " (*People v. Capistrano* (2014) 59 Cal.4th 830, 849, overruled on other grounds in *People v. Hardy* (2018) 5 Cal.5th 56, 103–104). We do not find the robbery here to be an exception; appellant ran into the victim's bedroom in the middle of the night and took the cell phone by intimidation, fear, and force. As for burglary, appellant relies on generalities purporting that not all burglaries are dangerous or pose harm to a person, and the burglary in this case was committed to effectuate a theft. We are not persuaded the burglary in this case should have been precluded from being joined with the other offenses. The circumstances of the burglary in the present case—that it involved a home invasion at night in appellant's ex-intimate partner's bedroom in the presence of her daughter resulting in the robbery—indicated it was properly joined with the other crimes of domestic violence.

We conclude the statutory requirements of joinder were met as a matter of law.

## II. Court's Discretion to Consolidate the Cases

The decision whether separate proceedings are required in the interests of justice, despite separate pleadings meeting the statutory requirements of joinder under section 954, is reviewed for an abuse of discretion. (*People v. Cunningham* (2001) 25 Cal.4th 926, 984.) It is appellant's burden to "establish clearly that a substantial danger of prejudice exists requiring that the charges be tried separately." (*Id*. at p. 985.) Joinder "may be an abuse of discretion where: (1) evidence on the crimes to be jointly tried would not be cross-admissible in separate trials; (2) certain of the charges are

unusually likely to inflame the jury against the defendant; (3) a 'weak' case has been joined with a 'strong' case, or with another 'weak' case, so that the 'spillover' effect of aggregate evidence on several charges might well alter the outcome of some or all of the charges; and (4) any one of the charges carries the death penalty or joinder of them turns the matter into a capital case." (*People v. Sandoval* (1992) 4 Cal.4th 155, 172–173.) Considering the first three factors (as appellant does not contend joinder turned the case into a capital case), we conclude the trial court did not abuse its discretion in granting the prosecution's motion to consolidate.

As for the first factor—cross-admissibility—the evidence of each incident was cross-admissible as evidence of other acts of domestic violence. Evidence Code section 1109 " 'permits the admission of [a] defendant's other acts of domestic violence for the purpose of showing a propensity to commit such crimes.' " (*People v. Brown* (2011) 192 Cal.App.4th 1222, 1232–1233.)

"Domestic violence" within the meaning of Evidence Code 1109, includes the definition set forth in section 13700, as well as the meaning set forth in Family Code section 6211, if the act occurred less than five years before the charged offense. (Evid. Code, § 1109, subd. (d)(3).) Section 13700 defines domestic violence as "abuse"— "recklessly causing or attempting to cause bodily injury, or placing another person in reasonable apprehension of imminent serious bodily injury to himself or herself, or another"—against, as relevant here, a spouse or former spouse. (§ 13700, subds. (a) & (b).)

Family Code section 6211 sets forth a broader definition of "abuse" within the meaning of "domestic violence." As relevant here, "abuse" includes "any behavior that has been or could be enjoined pursuant to [Family Code] Section 6320," which includes a long list of enumerated actions, including, as relevant here, "destroying personal property" and "disturbing the peace of the other party." (Fam. Code, §§ 6203, subd. (a)(4), 6320, subd. (a).) "[D]isturbing the peace of the other party" is further

11.

defined as "conduct that, based on the totality of the circumstances, destroys the mental or emotional calm of the other party." (*Id.*, § 6320, subd. (c).)

In applying these definitions, we conclude that all offenses here fall at least within the broader category of domestic violence under the Family Code and were thus cross-admissible as propensity evidence under Evidence Code section 1109. (See *People v. Ogle* (2010) 185 Cal.App.4th 1138, 1144 ["[Evidence Code s]ection 1109 applies if the offense falls within the Family Code definition of domestic violence even if it does not fall within the more restrictive Penal Code definition."].) Thus, the evidence of each incident would be cross-admissible in each proceeding had the offenses been tried separately.

Appellant argues that even though "the bare allegations in each individual incident may be cross-admissible in individual trials," the "volume" of evidence was not cross-admissible under Evidence Code section 352 as taking up an undue consumption of time and confusing the jury. Appellant reasons that the volume of evidence needed to prove an offense by a preponderance of the evidence as an uncharged act is substantially less than the evidence required to prove an act as a charged offense beyond a reasonable doubt. This argument is not persuasive. The California Supreme Court has reasoned offenses are deemed cross-admissible for the purposes of determining whether joinder prejudices a defendant where they would be cross-admissible only as an uncharged act in a separate proceeding. (See, e.g., *People v. Soper* (2009) 45 Cal.4th 759, 776–779 (*Soper*); *Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1226.) Appellant's Evidence Code section 352 concern does not persuade us to stray from this precedent. A crime which theoretically may have been deemed cross-admissible as an "uncharged act" becomes a *charged* act once it is consolidated with another charge. Thus, there is no risk of undue consumption of time simply because in a separate proceeding it would be introduced as an uncharged act because once consolidated with other charges as a

charged act, the People would have the burden of proving it beyond a reasonable doubt. There is no risk of jury confusion because the jury would be instructed accordingly.[4]

Further, appellant's argument regarding the "volume" of the evidence does not account for the overall savings of time and resources consolidation confers. Our high court has explained, " '[T]he issue of cross-admissibility "is not cross-admissibility of the charged offenses but rather the admissibility of relevant evidence" that tends to prove a disputed fact.' " (*People v. Capistrano*, *supra*, 59 Cal.4th at p. 849.) Moreover, " 'complete (or so-called two-way) cross-admissibility is not required. In other words, it may be sufficient, for example, if evidence underlying charge "B" is admissible in the trial of charge "A"—even though evidence underlying charge "A" may not be similarly admissible in the trial of charge "B." ' " (*People v. Hartsch* (2010) 49 Cal.4th 472, 493.) Finally, "the trial court's discretion under section 954 to deny severance is broader than its discretion to admit evidence of uncharged crimes … because additional factors favor joinder." (*Frank v. Superior Court* (1989) 48 Cal.3d 632, 639.)

Our conclusion the evidence of the incidents here was cross-admissible "alone is normally sufficient to dispel any suggestion of prejudice and to justify a trial court's refusal to sever properly joined charges." (*Soper*, *supra*, 45 Cal.4th at pp. 774–775.) Even if the evidence of the incidents were not cross-admissible, however, the absence of this factor is not similarly dispositive. (*Ibid*.) Section 954.1 explicitly states "evidence concerning one offense or offenses *need not be admissible* as to the other offense or offenses before the jointly charged offenses may be tried together before the same trier of fact." (Italics added.) "In the absence of cross-admissibility, we turn to the remaining

---

[4] Indeed, here, the jury was instructed with CALCRIM No. 852B, "EVIDENCE OF CHARGED DOMESTIC VIOLENCE," explaining that the charged crimes must by proven beyond a reasonable doubt before used to conclude appellant was likely to commit other charged domestic violence offenses.

13.

factors to assess whether the trial court abused its discretion." (*People v. Simon* (2016) 1 Cal.5th 98, 123–124.)

Turning to the next factor—whether any of the charges were likely to inflame the jury against the defendant—appellant argues "there was a substantial likelihood the jury would use evidence of one incident to punish [appellant] for the other." We disagree. The offenses here were all of similar levels of severity and egregiousness, and neither set of factual circumstances regarding either incident was any more inflammatory than the other.

Finally, as for the relative strength of the cases, "[t]he core prejudice concern arising in connection with this [factor] is that jurors may aggregate evidence and convict on weak charges that might not merit conviction in separate trials." (*People v. Simon*, *supra*, 1 Cal.5th at p. 127.) There is "no abuse of discretion if the evidence of guilt for each of the joint incidents is sufficiently compelling." (*Ibid*.)

Appellant contends the March incident case was the weaker of the two cases because, as to the January incident, there was physical evidence of the stun gun being used and, as to the March incident, "[o]nly Virgilia's bare allegations and her report to the police" supported the charge at the time the court granted the prosecution's motion. Appellant also argues that, as to the March incident, at the time of the ruling the court was aware that appellant had plans to argue Virgilia was lying to obtain a U-Visa and lay a claim of right defense.

We disagree with appellant's suggestion that the charges arising from the March incident did not contain sufficiently compelling evidence. Virgilia made a contemporaneous police report in the middle of the night and Michelle was witness to the incident. "In any event, as between any two charges, it always is possible to point to individual aspects of one case and argue that one is stronger than the other. A mere imbalance in the evidence, however, will not indicate a risk of prejudicial 'spillover effect,' militating against the benefits of joinder and warranting severance of properly

14.

joined charges.  (*People v. Ruiz* [(1988)] 44 Cal.3d 589, 606, 607 [] [severance not required of two properly joined murder charges even though evidence underlying one charge was 'relatively weak' and was made 'much stronger' by the evidence underlying the second charge].)"  (*Soper*, *supra*, 45 Cal.4th at p. 781.)

Appellant's suggestion that his attack on Virgilia's credibility based on her application for a U-Visa and his claim of right defense would be more successful if presented at a trial on the March incident alone is not persuasive.  The "benefits of joinder are not outweighed—and severance is not required—merely because properly joined charges might make it more difficult for a defendant to avoid conviction compared with his or her chances were the charges to be separately tried.  (E.g., *Zafiro v. United States* (1993) 506 U.S. 534, 540 ['[D]efendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials.'].)"  (*Soper*, *supra*, 45 Cal.4th at p. 781.)

In weighing the relevant factors, we conclude the court did not abuse its discretion by granting the prosecutor's motion to consolidate.

## III.  Gross Unfairness

Finally, appellant contends consolidation of the charges resulted in gross unfairness amounting to a denial of due process.  If joinder was proper and there was no sufficient showing of prejudice at the time the trial court ruled, we " 'still must determine whether, in the end [and in light of the evidence as presented at trial], the joinder of counts or defendants for trial resulted in gross unfairness depriving the defendant of due process of law.' "  (*Soper*, *supra*, 45 Cal.4th at p. 783; accord, *People v. Arias* (1996) 13 Cal.4th 92, 127 ["Even if the ruling was correct when made, we must reverse if [a] defendant shows that joinder actually resulted in 'gross unfairness,' amounting to a denial of due process."].)  "Gross unfairness" exists when there is a reasonable probability that joinder affected the jury's verdict.  (*People v. Merriman* (2014) 60 Cal.4th 1, 49.)

15.

Appellant alleges that several factors resulted in gross unfairness: (1) the trial was seven days' long; (2) the prosecution presented more evidence for the January incident than the March incident; (3) the fact that Michelle testified as to both incidents prejudiced appellant; and (4) appellant was unable to form a "cohesive" defense to both sets of charges. We do not agree these factors would have affected the jury's decision and conclude appellant did not meet his burden to prove his due process rights were violated by the consolidation of the cases.

As for the length of the trial and the difference between the amount of evidence for each charge, appellant does not explain, and we cannot ascertain, how this could have affected the jury's verdict.

As for Michelle's testimony, appellant contends that because Michelle had trouble remembering the events of the March incident at trial, her testimony as to that incident was "highly impeachable" and "put defense counsel in a difficult position when trying the cases together because questioning [Michelle] in depth about March 2 could diminish counsel's credibility with regard to January 2." We disagree.

Appellant was free to cross-examine Michelle about both incidents and did so. Appellant's contention that Michelle's testimony on the March incident was "highly impeachable" is not supported by the record. Appellant's defense to the charges related to the March incident was that appellant was not present at the time of the alleged offenses and did not commit them. Michelle testified when she woke up on March 2, she saw appellant running towards Virgilia. Even though Michelle had trouble remembering her statements to the police soon after the incident, the statements were properly admitted through the testimony of Officer Villalpando, and in those statements, Michelle stated she saw appellant.

Finally, appellant contends he had separate independent defenses to each charge, with the exception of his attack on Virgilia's credibility based on her U-Visa application,

16.

and, by having to defend both cases in one trial, he "was forced to throw everything at the wall to see what stuck" and, as such, his credibility was undermined.  We disagree.

The record indicates the jury gave appropriate consideration to appellant's defenses, specifically his defenses to the March incident.  The afternoon the jury began deliberating they submitted the following note:  "We would like to hear back a reading of the court record of [appellant's] testimony regarding the cell phone/money transactions on March 1st, 2017.  [¶]  Our question:  Was the transaction completed?"  This indicates the jurors did not simply discount appellant's defenses but discharged their duties appropriately.  The other question they asked further demonstrates their diligence in carrying out their duty:  "We need clarification on charge #1.  [¶]  Are we deciding if the stun gun is a deadly and dangerous weapon or is the stun gun a deadly or dangerous weapon?  [¶]  The jury instructions say [']or ['] but the verdict charge says [']and['].''  The jury's close attention to the issues presented by the trial, illustrated by the questions asked, demonstrates appellant was not prejudiced by the cases being tried together.

Appellant has not shown a reasonable probability joinder affected the jury's verdict.  We conclude the trial court's order granting consolidation of the charges did not render appellant's trial grossly unfair so as to violate his due process rights.

The trial court did not err by granting the prosecution's motion to consolidate.

### DISPOSITION

The judgment is affirmed.

DE SANTOS, J.

WE CONCUR:

PEÑA, ACTING P. J.

MEEHAN, J.

17.